**STATE of Tennessee, Appellant,**

v.

**Terry PULLY, Appellee.**

Supreme Court of Tennessee,
at Nashville.

Aug. 30, 1993.

Rehearing Denied Sept. 27, 1993.

Charles W. Burson, Atty. Gen. & Reporter, Christina Norris, Counsel for the State, Nashville, for appellant.

Michael R. Jones, Springfield, for appellee.

## OPINION

DAUGHTREY, Justice.

We granted review of this case in order to determine whether a police officer, investigating two urgent, anonymous reports of a man threatening people with a shotgun, acted reasonably under the Fourth Amendment to the United States Constitution and Article 1, Section 7, of the Tennessee Constitution by briefly stopping the defendant to investigate the reports. Because we believe that the officer acted reasonably under the circumstances, we find that the evidence seized during the stop was improperly excluded. The decision of the Court of Criminal Appeals upholding the trial court's suppression order is, therefore, reversed, and the case is remanded to the trial court.

The record of the suppression hearing in this case indicates that Officer Paul McKissack received a radio report that the defendant, Terry Pulley, was driving a yellow Ford L.T.D. in the Village Green Trailer Park, was armed with a shotgun, and was "supposed to shoot someone." On his way to

the site of the alleged incident, the officer received another similar, urgent report. Officer McKissack arrived at the trailer park within ten to twelve minutes of the first report and did not find Pulley, whom he knew, to be there. The officer then drove to a gas station about an eighth of a mile away where Pulley was parked in a yellow Ford. According to the officer, when he arrived, the defendant's car "might have started rolling a little bit," so the officer turned on his blue lights to signal Pulley to stop. After asking the defendant to get out of the car, the officer saw a shotgun on the front floorboard. He arrested the defendant for driving on a revoked license, for a second offense of driving under the influence of alcohol, and for possessing a loaded weapon, a hunting knife, and a billy club with the intent to go armed. The trial court suppressed the weapons and the results of the blood/alcohol test, however, presumably agreeing with the defendant's contention that the officer had no reasonable suspicion that the defendant had or would commit a crime, and therefore, no justification for the stop.

On appeal from the trial court's dismissal of the indictment and the Court of Criminal Appeals's affirmance, the state argues two points. Insisting, first, that the defendant was not "seized" within the meaning of the United States or the Tennessee Constitution, the state also contends that even if a "seizure" occurred, the officer acted reasonably under the circumstances.

■■■ The first of these assertions is meritless. A police officer may approach a car parked in a public place and ask for driver identification and proof of vehicle registration, without any reasonable suspicion of illegal activity. *State v. Butler,* 795 S.W.2d 680, 685 (Tenn.Crim.App.1990) (citing *Michigan v. Chesternut,* 486 U.S. 567, 575–76, 108 S.Ct. 1975, 1980–81, 100 L.Ed.2d 565 (1988)); *see generally Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229 (1983), and cases collected at 3 LaFave, *Search and Seizure* § 9.2(h) note 230 (2d ed.1987). This case involves more than a mere approach, however. Officer McKissack testified that Pulley's car had begun to move, and thus, rather than approach a parked car,

the officer turned on his blue lights to stop the defendant. When an officer turns on his blue lights, he or she has clearly initiated a stop. *See United States v. Hensley,* 469 U.S. 221, 226, 105 S.Ct. 675, 679, 83 L.Ed.2d 604 (1985); *Colorado v. Bannister,* 449 U.S. 1, 4 n. 3, 101 S.Ct. 42, 44 n. 3, 66 L.Ed.2d 1 (1980). Moreover, as the United States Supreme Court observed in *Terry v. Ohio,* 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968), "[i]t must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *See also United States v. Brignoni–Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975). From the moment that Officer McKissack turned on his blue lights and brought Pulley to a stop, Pulley was certainly not free to leave the scene but, rather, had been "seized" within the meaning of the *Terry* decision.

■■■ Having established that Pulley was "seized" when he was pulled over, the next question is whether the stop complied with both state and federal constitutional prohibitions against "unreasonable searches and seizures." In general, although the Fourth Amendment requires "probable cause" before an arrest is deemed to be reasonable, the reasonableness of seizures less intrusive than a full-scale arrest is judged by weighing the gravity of the public concern, the degree to which the seizure advances that concern, and the severity of the intrusion into individual privacy. *See, e.g., Brown v. Texas,* 443 U.S. 47, 50, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979). In *Terry v. Ohio,* 392 U.S. at 20–1, 88 S.Ct. at 1879–80, the United States Supreme Court acknowledged police officers' need for "an escalating set of flexible responses, graduated in relation to the amount of information they possess." *Id.* at 10, 88 S.Ct. at 1874. The *Terry* Court held that to justify a stop, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. at 1880.

■■■ In *Terry,* the United States Supreme Court permitted an brief investigative stop and protective frisk for weapons in response

to an officer's reasonable suspicion that men were "casing a joint" for a robbery. The Court held that a "stop and frisk" is constitutionally permissible

> where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and dangerous....

392 U.S. at 30, 88 S.Ct. at 1884. In *Adams v. Williams*, 407 U.S. 143, 147, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 (1972), the Court extended the use of the investigative stop, rejecting the argument "that reasonable cause for a stop and frisk can only be based on the officer's personal observation, rather than on information supplied by another person." The Court insisted that when a known informer gives an officer information "immediately verifiable at the scene," the information may carry "enough indicia of reliability to justify the officer's forcible stop. . . ." *Id.* at 146–7, 92 S.Ct. at 1923–24.[1] Thus, the Fourth Amendment permits an investigative stop based on the corroborated tip of an informant in circumstances involving an immediate threat of danger.

When a stop is based on the tip of an informant, however, the danger of false reports, through police fabrication or from vindictive or unreliable informants, becomes a concern.[2] Thus, both state and federal courts have developed tests for determining the reliability of informants' tips. In the context of "probable cause" determinations, Tennessee law requires a showing of both the informant's credibility and his or her basis of knowledge. *See State v. Jacumin*, 778 S.W.2d 430, 436 (Tenn.1989). The Court in *Jacumin* held that

> while independent police corroboration could make up deficiencies in either prong,

each prong represents an independently important consideration that 'must be separately considered and satisfied in some way.'

*Id.* Although this standard for probable cause mimics the former federal test,[3] the United States Supreme Court has abandoned this strict two-pronged test in favor of a "totality of the circumstances" analysis of probable cause. *See Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Unlike *Jacumin*, which requires "[s]ome showing of veracity and some showing of basis of knowledge,"[4] a majority of the Court in *Gates* agreed that "a deficiency in one [prong] may be compensated for ... by a strong showing as to the other...." *Id.* at 233, 103 S.Ct. at 2329. Tennessee's constitutional principles, however, continue to require both elements of informant reliability.[5]

In the context of the investigatory stop, which requires "a lower quantum of proof than probable cause,"[6] we also find the *Jacumin* factors useful in considering the reliability of a tip. The Court of Criminal Appeals applied *Jacumin's* two-pronged approach to a case involving an investigatory stop of a woman anonymously reported to be carrying drugs in her car. In *State v. Coleman*, 791 S.W.2d 504 (Tenn.Crim.App.1989), the informant stated that the defendant would travel along a given road to an identified location at a certain time with marijuana. The police stopped the defendant before corroborating enough details of the tip to substantiate the informant's credibility. The report, moreover, did not possess, "even by way of inference," the tipster's basis of knowledge. The Court of Criminal Appeals held that

> while further independent corroboration may generally make up any deficiencies in an informant's tip, neither the informant's

---

1. In *Adams*, the tipster stated that someone in a nearby car was carrying a gun and illegal drugs.

2. *The Supreme Court, 1971 Term*, 86 Harv.L.Rev. 50, 178–80 (1972).

3. *See Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

4. *Jacumin*, 778 S.W.2d at 434.

5. This Court observed that the two-prong *Aguilar–Spinelli* test "is more in keeping with the Tennessee constitutional requirement that no warrant issue without evidence of the fact committed." *See* Tennessee Constitution, Article I, Section 7; *Jacumin*, 778 S.W.2d at 436.

6. *See United States v. White,* 648 F.2d 29, 42 (D.C.Cir.1981).

reliability nor his basis for knowledge was sufficiently substantiated in this case to establish the necessary 'reasonable and articulable suspicion' required by our state constitution.

*Id.* at 507. The ultimate question when confronted with an anonymous caller, then, is how much corroboration is necessary to show sufficient credibility and basis of knowledge.

Although the *Jacumin* factors are helpful in determining not only whether "probable cause" exists, but whether "specific and articulable facts" justify a stop,

> [r]easonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

*Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990). With this in mind, we look at the facts as presented to Officer McKissack.

In examining the reliability of the information given to the officer, we first look to whether the officer could determine the informant's basis of knowledge. Although the informant did not explicitly state his basis of knowledge, the circumstances in which the tip was given suggest a first-hand basis of knowledge. The investigating officer received two urgent reports minutes before arriving at the trailer park.

When an informant reports an incident at or near the time of its occurrence, a court can often assume that the report is first-hand, and hence reliable. In *State v. Kuahuia,* 62 Haw. 464, 616 P.2d 1374, 1375 (1980), for example, the court viewed as important the fact that the informant immediately reported his first-hand observations of the crime. *Cf. State v. Joao,* 55 Haw. 601, 525 P.2d 580, 583 (1974) (absence of an "adequate anchor, as to time and place" suggests unreliable basis of knowledge). In *Vannatta v. State,* 773 S.W.2d 771, 773–4 (Tex.App.1989),

a Texas court emphasized that the proximity in time between an anonymous report and the police investigation is significant in assessing the reliability of a tip. In *Lawson v. United States,* 360 A.2d 38, 40 (D.C.App. 1976), the District of Columbia Court of Appeals determined that a hurried description from an anonymous source who insists on immediate action suggests eye-witness reliability and is sufficient for further investigation. Similarly, in *Henighan v. United States,* 433 A.2d 1059, 1064–5 (D.C.App.1981), in allowing the stop of a woman described as carrying a gun and narcotics in a specified location, the court found that where a call is contemporaneous with the police corroboration of the tip, one can assume eyewitness reliability on the part of the tipster. These cases illustrate the importance of the timing of the tip in assessing the reliability of the informant, for timing implies an eyewitness basis of knowledge.

In this case, although the investigating officer could have assumed that the informant was an eye-witness, the credibility of the informant was largely unknown. The corroboration of several of the details of the reports, such as the identity of the driver, the description of the car, and the general location of the incident, supported the informant's credibility. The tip was not fully corroborated, however, because the defendant was not in the trailer park when Officer McKissack arrived. Under many circumstances, therefore, the officer would lack a reasonable suspicion that criminal activity was afoot.

But, reliability of the informant's tip is not the only determinant of the reasonableness of the stop. The content of the tip is also a crucial factor and, in particular, the level of danger that the tip reveals. In *Alabama v. White,* 496 U.S. at 330, 110 S.Ct. at 2416, the United States Supreme Court stated that

> reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its reliability. Both factors—quality and quantity—are considered. . . . [7]

---

7. *Alabama v. White* was decided under the *Gates* test, which reviews the "totality of the circum-

stances" for reasonable suspicion to stop. Under either *Gates* or *Jacumin,* however, a court must

In *Adams,* refusing to issue a general rule on the reasonableness of a stop, the Court emphasized that

> [s]ome tips, completely lacking in indicia of reliability, would either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized. But in some situations—for example, when the victim of a street crime seeks immediate police aid and gives a description of his assailant, or when a credible informant warns of a specific impending crime—the subtleties of the hearsay rule should not thwart an appropriate police response.

*Id.,* 407 U.S. at 147, 92 S.Ct. at 1924. Although members of the *Adams* Court disputed the appropriate point of police intervention based on informants' tips, they agreed on the need for immediate police action in response to serious threats of harm. For example, while dissenting Justices Douglas, Marshall, and Brennan voiced their concerns with stopping suspects for "possessory offenses," Justice Brennan insisted that *Terry* "was meant for the serious cases of imminent danger or of harm recently perpetrated." *Id.* at 151–3, 92 S.Ct. at 1926–27. The whole Court thus recognized that the seriousness of the criminal threat is an important factor in determining the reasonableness of a police response and the reliability required of an informant's tip.

This principle is reflected in the decisions of several jurisdictions which have justified the use of brief investigatory stops in cases involving anonymous tips of people carrying deadly weapons. In *Henighan v. United States,* 433 A.2d at 1064, for example, the court stated that "[i]nformation that the contraband is a concealed weapon may justify an even swifter intrusion on the rights of a citizen than in other circumstances." The Hawaii Supreme Court upheld a stop pursuant to an anonymous report of a man carrying a rifle in his car. Holding that because the police "substantially confirmed the reliability of the information received and especially because a firearm was allegedly in-

volved, the police were duty bound to make at least a temporary stop for investigative purposes." *Kuahuia,* 616 P.2d at 1375. An Illinois Court stated that "[t]he fact that the officers had information that the complaint they were investigating involved a man with a gun casts a heavy weight in favor of the reasonableness of the search." *People v. Smithers,* 83 Ill.2d 430, 438, 47 Ill.Dec. 322, 327, 415 N.E.2d 327, 332 (1980). Moreover, in *State v. Flowers,* 441 So.2d 707 (La.1983), *cert. denied,* 466 U.S. 945, 104 S.Ct. 1931, 80 L.Ed.2d 476 (1984), the Louisiana court reviewed an investigatory stop and subsequent arrest pursuant to an anonymous report that the defendant was driving a car in a specified area carrying the possessions of a recent murder victim. In upholding the reasonableness of the stop, the court weighed the "modest" intrusion against the heavy public interest in solving the murder investigation. Finally, in response to an anonymous tip describing a man with a concealed shotgun at a certain location, the court in *United States v. McClinnhan,* 660 F.2d 500, 503 (D.C.Cir. 1981), stated:

> We think that where their suspicion has some objective foundation, the Fourth Amendment does not, *particularly where the reported contraband is a weapon as lethal as a sawed-off shotgun,* require a police officer to ignore his well-founded doubts and accordingly will permit an investigative detention.

These cases show that the gravity of the perceived harm is a crucial element in assessing the reasonableness of an investigative *Terry* stop.

In some cases, courts have justified police stops in response to threats of violence, reasoning that the alternatives in such cases involve too much risk. For instance, in *Smithers,* the court stated:

> We should evaluate the officers' actions in light of one's reaction had they failed to act.... Had the officers not conducted the stop and frisk, someone could well have been killed or seriously injured.

assess the content of the informant's tip, as well as the reliability of the tip, when determining the

reasonableness of a police stop.

83 Ill.2d at 439, 47 Ill.Dec. at 327, 415 N.E.2d at 332. In *McClinnhan*, 660 F.2d at 502–3, the court recognized the officers' "unappealing choice":

> Either they stopped [the defendant] on the basis of the tip as corroborated by their observation or they could at best follow him through the streets of Washington hoping he would commit a crime, or at least brandish the weapon, out of doors, rather than walking inside a dwelling, and thus beyond police purview, before putting the shotgun to its intended use.

The Hawaii court described the police as "duty bound" to stop a person anonymously identified as carrying a rifle. *See Kuahuia*, 616 P.2d at 1375. Finally, one court differentiated an anonymous tip involving a weapon from other types of tips as follows:

> The element of imminent danger distinguishes a gun tip from one involving possession of drugs. If there is any doubt about the reliability of an anonymous tip in the latter case, the police can limit their response to surveillance or engage in "controlled buys." Where guns are involved, however, there is the risk that an attempt to "wait out" the suspect may have fatal consequences.

*United States v. Clipper*, 973 F.2d 944, 951 (D.C.Cir.1992). Thus, the consequences of a police officer's failure to investigate a tip must be considered when assessing the reasonableness of a stop.

As one justice articulated in *United States v. Mendenhall*, 446 U.S. 544, 561, 100 S.Ct. 1870, 1881, 64 L.Ed.2d 497 (1980) (Powell, J., concurring):

> The reasonableness of a stop turns on the facts and circumstances of each case. In particular, the Court has emphasized (i) the public interest served by the seizure, (ii) the nature and scope of the intrusion, and (iii) the objective facts upon which the law enforcement officer relied in light of his knowledge and experience.

In this case, the public interest served by the stop was the prevention of violent crime. The scope of the intrusion was minor; it was intended to be only a temporary stop of the defendant's car. Finally, the "indicia of reliability" were sufficient in light of these other considerations to warrant a brief investigatory stop. The timely nature of the report indicated an eye-witness basis of knowledge, and the corroboration of many of the informant's details, although not all, provided some basis to believe that the informant was credible. Although the reliability of the tip would certainly not establish probable cause to search or arrest, and would not furnish reasonable suspicion to stop the defendant in all circumstances, we conclude that, given the threat of violence, the police had "specific and articulable facts" to warrant the investigatory stop in this case. We therefore reverse the decision of the Court of Criminal Appeals and remand this case to the trial court for further proceedings in accordance with this opinion.

REID, C.J., and DROWOTA, O'BRIEN and ANDERSON, JJ., concur.