**IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE**

**AT JACKSON**

**JUNE SESSION, 1999**

**FILED**

**August 10, 1999**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | **)** | **C.C.A. NO. 02C01-9809-CC-00266** |
| | **)** | |
| Appellee, | **)** | |
| | **)** | |
| | **)** | **CARROLL COUNTY** |
| **VS.** | **)** | |
| | **)** | **HON. C. CREED McGINLEY** |
| **KEVIN BIRTRAN HALTER,** | **)** | **JUDGE** |
| | **)** | |
| Appellant. | **)** | (Certified Question-Search) |

ON APPEAL FROM THE JUDGMENT OF THE
CIRCUIT COURT OF CARROLL COUNTY

FOR THE APPELLANT:

RAYMOND L. IVEY
P.O. Box 667
Huntingdon, TN 38344

FOR THE APPELLEE:

PAUL G. SUMMERS
Attorney General and Reporter

J. ROSS DYER
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN 37243

ROBERT RADFORD
District Attorney General

ELEANOR CAHILL
Assistant District Attorney General
P.O. Box 686
Huntingdon, TN 38344

OPINION FILED _____

AFFIRMED

DAVID H. WELLES, JUDGE

# OPINION

On May 4, 1998, the Carroll County Grand Jury indicted the Defendant, Kevin Birtran Halter, for possession of a Schedule II controlled substance with the intent to manufacture, deliver or sell; possession of a Schedule VI controlled substance with the intent to manufacture, deliver or sell; possession of unlawful drug paraphernalia; and possession of burglary tools. The Defendant filed a motion to suppress all evidence seized during the search of his vehicle, and following a hearing, the trial court denied the motion. On July 21, 1998, the Defendant pleaded guilty to all charges, reserving three certified questions of law. The trial court sentenced him as a Range I standard offender to eight years for the possession of a Schedule II controlled substance, to two years for the possession of a Schedule IV controlled substance, and to eleven months and twenty-nine days for the possession of drug paraphernalia and the possession of burglary tools. The Defendant presents two issues for our review on appeal: (1) whether the arresting officer had sufficient reasonable suspicion based on specific and articulable facts to detain the Defendant for investigation; and (2) whether the warrantless search of the Defendant's vehicle was pursuant to valid consent.

At the hearing on the motion to suppress, Officer Clint Hilliard, an officer with both the Trezevant Police Department and the Carroll County Sheriff's Department at the time of the Defendant's arrest, testified about the events surrounding the arrest. He reported that on March 3, 1998 at approximately midnight, he was patrolling downtown Trezevant and noticed the Defendant's car parked in front of a vacant store located next to a laundromat. All of the

businesses were closed, with the exception of the laundromat. The engine of the Defendant's vehicle was turned off, and the windows of the vehicle were fogged, which indicated to Hilliard that someone was inside.

Hilliard reported that he decided to check the vehicle "for the safety of the community and the safety of the people in the vehicle." He stated, "I didn't know if somebody had been shot, killed, stabbed, they was making out or what . . . . I was just doing my job." Don Newbill, Chief of Police in Trezevant, testified that there had recently been numerous break-ins, some vandalism, three arson fires, and one attempted arson fire in the immediate area where the Defendant's car was parked on the night of his arrest. Newbill emphasized that for these reasons and because of the incidence of drunk drivers after the nearby bars closed, the area was carefully patrolled. He stated that his officers were instructed to "patrol the corporate city limits of Trezevant, paying particular attention to any and all businesses, to anybody that comes in the area, to watch them and, at [the officer's] discretion, check on their welfare, their safety, where they're going and what they're doing."

Hilliard pulled his patrol car behind the Defendant's vehicle, turned on his "take-down lights," which he described as a halogen light, and approached the vehicle. He stated that he knocked on the driver's window three times before the Defendant, who was sitting in the driver's seat, acknowledged him. On the third knock, the Defendant cracked his window, and a strong odor of cologne emanated from the car. Shortly thereafter, a female, later identified as Cheryl McKinlay, came up from the floorboard of the car. Both the Defendant and the

female passenger had apparently been asleep when Hilliard approached the vehicle.

Hilliard requested to see the Defendant's driver's license and registration. He then asked the Defendant where he and his companion had come from and where they were headed. The Defendant first told him that they had come from Memphis and were headed to Memphis and then corrected himself, stating that they were going to Indiana. According to Hilliard, the Defendant reported that he and his passenger had become tired while driving and had pulled over to take a nap. While conversing with the Defendant and his passenger, Hilliard shone his flashlight into the car and saw a box of aluminum foil with half a sheet torn off, an open box of baking powder, a mug containing some type of liquid between the Defendant's feet on the floorboard, a map on the floorboard, an open cosmetics bag containing personal hygiene items, a number of bags from fast food restaurants, and clothes strewn about the back seat of the car.

Hilliard testified that he asked the Defendant if the car belonged to him, and the Defendant responded that it did. He next asked the Defendant if there were any weapons or drugs in the car, and the Defendant answered no to both questions. Hilliard stated that he then asked the Defendant whether he could look inside the vehicle, and the Defendant replied, "What are you looking for?" Hilliard stated that he answered, "The above items that I just asked you about." According to Hilliard, the Defendant responded, "No, go ahead. There's nothing in here."[1]

---

[1] At the hearing on the motion to suppress, Officer Hilliard stated that he could not remember his conversation with the Defendant verbatim but maintained that he was given permission to search the vehicle. Although he could not remember the Defendant's exact

-4-

Hilliard asked the Defendant and his companion to step out of the car, and they exited the vehicle and stood to the rear of the car while Hilliard conducted a search of the vehicle. Hilliard testified that he discovered a "glass beacon that had what appeared to be . . . the residue of either cocaine or methamphetamines" between the front two seats. He also discovered a plastic bag containing forty-six grams of cocaine beneath the front seat along with a "wad of money." After discovering the cocaine, Hilliard placed both the Defendant and McKinlay under arrest and called for backup. While waiting for other officers to arrive, Hilliard discovered an aluminum foil package containing 5.4 grams of cocaine in the leg of McKinlay's pants. A second police officer arrived at the scene with a drug dog and conducted a thorough search of the Defendant's vehicle. In addition to the drugs that had already been found, the drug dog led officers to the discovery of 27.8 pounds of marijuana in the trunk of the vehicle.

The Defendant testified that he and his companion had been traveling on the night of his arrest and had stopped to take a nap and do laundry at the Trezevant laundromat.[2] He claimed that when Officer Hilliard asked whether he could search his vehicle, he responded, "No, I don't think so." He reported that immediately after he replied to the question, Hilliard opened the door to his car, grabbed his arm, and demanded that he and his companion step out of the vehicle. According to the Defendant, Hilliard told him and his companion to put

words, he presented several possible versions of the Defendant's response, including "No, go ahead. There's nothing in here."; "Yes, sir. . . . There's nothing in the car. You can look."; "No, that's fine. There's nothing in there."; and "Yes, you can search the vehicle."

[2] Hilliard testified that on the night of his arrest, the Defendant made no mention of stopping to wash laundry.

their hands on the trunk of the vehicle while he searched the car, and after discovering the glass vial between the front seats, Hilliard handcuffed him before completing his search of the vehicle.

Cheryl McKinlay, the Defendant's traveling companion, also testified at the hearing. Through her testimony, she presented essentially the same version of events on the night of the arrest as did the Defendant. Like the Defendant, she claimed that when Officer Hilliard requested to search the car, the Defendant responded, "I don't think so."

## I. REASONABLE SUSPICION

The Defendant first argues that Officer Hilliard did not have "sufficient reasonable suspicion based on specific and articulable facts in order to seize and detain [the Defendant] for investigation." We are thus called upon to determine whether the Defendant's detention amounted to a Fourth Amendment seizure. If his detention was a seizure under the Fourth Amendment, we must then determine whether the officer possessed an articulable reasonable suspicion for an investigatory stop under Terry v. Ohio, 392 U.S. 1 (1968). If the stop was a seizure and if there was not sufficient cause to stop the Defendant, then the evidence should have been suppressed. Interactions between the police and the public that are seizures but not arrests, are judged by their reasonableness, rather than by a showing of probable cause. Terry, 392 U.S. at 20.

In Terry v. Ohio, the Supreme Court stated that not every encounter between a policeman and a citizen is a seizure. Terry, 392 S.W.2d at 19 n.16. "Only when the officer, by means of physical force or show of authority, has in

-6-

some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Id. In United States v. Mendenhall, the Supreme Court set forth the test to be applied in determining whether "a person has been 'seized' within the meaning of the Fourth Amendment": An officer may be said to have seized an individual "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554 (1980); State v. Moore, 776 S.W.2d 933, 937 (Tenn. 1989).

Under Tennessee law, "a police officer may approach a car parked in a public place and ask for driver identification and proof of vehicle registration, without any reasonable suspicion of illegal activity." State v. Pulley, 863 S.W.2d 29, 30 (Tenn. 1993). Moreover,

> [n]umerous cases hold that officers do not seize an individual by simply talking to him or her in a public place or while the individual being questioned is sitting inside an already stopped vehicle. Other courts have held that a request to search, standing alone, is not conclusive evidence that a "seizure" has occurred.
> A statement by an officer that the accused has become the specific focus of an investigation is one circumstance which may be considered in determining whether a seizure has occurred, but all of the circumstances of the case must be examined. In most of the cases holding that a seizure has occurred, something more than a mere inquiry or request by police officers has been shown.

Moore, 776 S.W.2d at 938 (citations omitted).

The Defendant points out that the officer used his "take-down lights" while approaching the car and contends that the use of a halogen light is analogous to the use of blue lights, which generally indicates that the officer has clearly initiated a stop. See State v. Yeargan, 958 S.W.2d 626, 630 (Tenn. 1997). We disagree. The use of a halogen light for the officer's personal safety at night

when approaching a vehicle is not the same as the use of blue lights to indicate to a driver that he or she must comply with the officer's request to stop his or her vehicle. In a situation like the one at hand, where an officer approaches a parked vehicle at midnight on a deserted street, it is certainly reasonable for the officer to use a light while assessing the situation during his or her initial confrontation with the driver of the vehicle.

In the present case, we conclude that no "seizure" within the meaning of the Fourth Amendment occurred. Officer Hilliard approached the Defendant's already stopped vehicle in a public parking area, asked to view the Defendant's driver's license and registration, and asked the Defendant and his companion why they were parked at that location at that time of night. This interaction, without further evidence of some show of force, does not amount to a seizure. During his conversation with the Defendant, Hilliard noticed items in plain view inside the vehicle which, to a trained police officer, indicated that the Defendant might be involved in some type of illegal drug activity. This prompted Hilliard to ask for permission to search the vehicle, which brings us to the second issue presented for our review, the validity of the Defendant's consent.

## II. CONSENT

The Defendant next argues that Officer Hilliard's warrantless search of the Defendant's vehicle was not pursuant to valid consent. Officer Hilliard testified that when asked whether he would allow his car to be searched, the Defendant responded, "No, go ahead. There's nothing in here." However, both the Defendant and McKinlay testified that the Defendant responded, "I don't think so."

A trial judge's factual findings on a motion to suppress have the weight of a jury verdict and are conclusive on appeal unless the evidence clearly preponderates against them. State v. Woods, 806 S.W.2d 205, 208 (Tenn. Crim. App. 1990); State v. Jones, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Testimony by the Defendant and McKinlay indicating that the Defendant did not consent to the search of his car presents a classic question of fact for resolution by the trial judge. Having heard all testimony at the hearing on the motion to suppress, the trial judge concluded,

> [The Defendant's] testimony is somewhat supportive of [McKinlay's testimony]. But the Court finds it rather incredible when you stop to think that his purpose of stopping at this laundromat at these very late hours when he was in transit from either Texas or Memphis to Indiana was for the purpose of washing his clothes at this late hour.
>
> The Court finds [that the Defendant's] testimony is pretty incredible. And, obviously, both parties have an interest in the outcome of this case. In judging the credibility of the witnesses, the Court feels that consent was given. The Court might observe that it would have been a better practice had some type of written document been prepared so that questions like this don't come up subsequent, where it involves the Court making a determination of credibility of the witnesses, that if there had been a signed consent form there would be no question here.
>
> Also, the Court observes that for consent to be valid that one must be aware that they've got a constitutional right not to consent, and they must freely and voluntarily give that right up. The testimony in this case indicates that the consent was consensual, that it was freely and voluntarily given.

The evidence clearly does not preponderate against the findings of the trial judge.

We therefore decline to disturb the trial judge's conclusion on appeal.

The judgment of the trial court is accordingly affirmed.


_____
DAVID H. WELLES, JUDGE

CONCUR:

_____
DAVID G. HAYES, JUDGE


_____
NORMA McGEE OGLE, JUDGE