# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
March 1, 2011 Session

## STATE OF TENNESSEE v. JESSIE LEE PALMER

**Direct Appeal from the Circuit Court for Dyer County**
**No. 09-CR-470    Lee Moore, Judge**

---

**No. W2010-01073-CCA-R3-CD  - Filed November 14, 2011**

---

The Defendant-Appellant, Jessie Lee Palmer, pled guilty in the Circuit Court of Dyer County to promotion of methamphetamine manufacture, a Class D felony.  He was sentenced as a Range II, multiple offender and received four years' imprisonment.  Pursuant to Rule 37(b)(2)(A) of the Tennessee Rules of Criminal Procedure, Palmer reserved certified questions of law addressing whether the trial court erred in denying his motion to suppress evidence obtained following the stop and search of a taxicab in which Palmer was a passenger.[1]  In this appeal, the Defendant-Appellant, raises the following issues for our review: (1) whether he has standing to challenge the search; (2) whether the officers had

---

[1]We are compelled to observe that the Defendant-Appellant timely filed multiple amendments to the judgment and order, clarifying his certified question to this court.  The final supplemental order showed the following list of certified questions:

> a.  Whether there was no probable cause for the . . . stop of the taxi cab?
> b.  Whether there was reasonable suspicion for the stop?
> c.  Assuming underdo arguendo that the stop was illegal, whether the consent of the taxi driver was sufficiently attenuated from the illegal stop and, therefore, the evidence obtained was not fruit of the poisonous tree or an exploitation of the prior illegal stop?
> d.  Whether the trial court erred in not suppressing the . . . evidence obtained after the taxi cab the defendant was traveling in prior to his arrest on October 29, 2009, was stopped . . . .
> e.  Whether or not [sic] Defendant Jessie Palmer had an expectation of privacy as a passenger of the taxi cab?
> f.  Whether or not [sic] the consent by the driver/owner of the vehicle was effective as to its passengers under the common authority doctrine?
> g.  Whether or not [sic] the permission from the taxi cab driver to search the vehicle in question was constitutionally permissible as to Defendant Jessie Palmer.
> h.  Whether or not [sic] Defendant Jessie Palmer had standing to challenge the legality of the stop and search of the taxi cab and the consent given by the taxi cab driver.

The Defendant-Appellant's appellate brief condenses these questions into the four issues presented for our review in this appeal.

reasonable suspicion to stop the car; (3) whether the taxicab driver's consent to search was obtained as a result of an illegal stop; and (4) whether the evidence seized from the taxicab should have been suppressed as fruit of the poisonous tree. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Martin E. Dunn, Dyersburg, Tennessee for the Defendant-Appellant, Jessie Lee Palmer.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; and C. Phillip Bivens, District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

Following a traffic stop of a taxicab in which Palmer and Haleaka Childress were passengers, police officer's obtained consent from the taxicab driver to search the internal area of the taxicab. The police officer retrieved various items related to the production of methamphetamine from a bag located in the backseat of the taxicab, including a gas generator, a Sprite bottle containing an ammonia based yellow liquid, another Sprite bottle with "white tape and a metal filter type of material on the side of the cap," two twelve by twelve inch pieces of aluminum foil, two Mason jars, and a plastic cup with coffee filter material inside of it. Palmer and Childress, seated in the backseat of the taxi at the time of the stop, were arrested and later charged with the promotion of methamphetamine manufacture. Palmer filed a motion to suppress the evidence obtained as a result of the stop and search, arguing that the officers lacked reasonable suspicion to stop the car, the consent to search was obtained as a result of the illegal stop, and all evidence seized was fruit of the illegal stop. Following a suppression hearing, the trial court denied the motion. Palmer subsequently pled guilty to promotion of methamphetamine manufacture, properly reserving for appeal certified questions of law challenging the basis for the stop and the seizure of the evidence.

**Suppression Hearing.** Deputy Adam Fisher of the Dyer County Sheriff's Department testified that he received a call around 10:30 p.m. on October 28, 2009, from someone claiming to have information about Palmer. The caller informed him that Palmer had hidden some items used to manufacture methamphetamine "in a fence–in the curve

before you get to Holly Springs coming from Fowlkes on Old Fowlkes Road." Deputy Fisher testified that the caller told him Palmer would be at the location to pick up the items between 11:00 p.m. and 1:00 or 1:30 a.m. The caller did not say how he or she knew the information.

Deputy Fisher testified that he knew the caller, the identity of whom he wished to remain confidential. He stated that the person had not previously provided information that led to arrests, convictions, or the seizure of narcotics. He believed however that the caller was "part of the criminal realm or involved with criminal activity." He considered the information the caller provided to be reliable, based in part on the specificity of the information concerning the location of the items. Deputy Fisher stated that at the time of the call he was familiar with Palmer, including Palmer's prior convictions related to methamphetamine and pending charges related to methamphetamine manufacture.

Deputy Fisher testified that, after receiving the call, he and Deputy Stoney Hughes drove to the location the caller had described, arriving there approximately thirty minutes after the call. Deputy Fisher dropped Deputy Hughes off at the location. Deputy Fisher drove about one mile away to Fowlkes, where he said he sat and waited. After a couple of hours had passed, Deputy Fisher received a call from Deputy Hughes, reporting that someone came through the area. Deputy Hughes told him that he could not see who the person was. Deputy Fisher testified that Hughes thought the person had heard his police radio and fled across the road into a cotton field.

Upon receiving Deputy Hughes' call, Deputy Fisher drove toward the area. He said that Deputy Hughes further communicated that the person left the cotton field and entered a car. Deputy Fisher testified to finding a taxicab where Deputy Hughes described. He followed the taxicab to Highway 51 and Samaria Bend, where he stopped the car. He testified that he waited to approach the car until Deputy Barton arrived to assist him.

Once Deputy Fisher approached the taxicab, he saw two passengers, a male and a female, in the car. He testified that he recognized the male as Palmer. Deputy Fisher stated that he then spoke with the driver, who said he had picked up the male passenger on Old Fowlkes Road and the female passenger on Peach Road. Deputy Fisher testified that he could not recall the order in which the driver said he had picked up the passengers.

Deputy Fisher spoke with Palmer, had Palmer exit the vehicle, and patted him down for officer safety. Deputy Fisher testified that he did not find any weapons on Palmer, but he noticed that Palmer's pants were wet from the waist down to his feet. Deputy Fisher stated that when he asked Palmer why his pants were wet, Palmer replied that he had stepped in a mud puddle on Old Fowlkes Road. Deputy Fisher testified that Palmer's explanation did

not make sense to him. Although he recalled that there was a heavy dew on the plants that night, he did not recall there being any mud holes in the area. Deputy Fisher stated that Palmer denied picking up any components for the manufacture of methamphetamine or having any methamphetamine in his possession.

Deputy Fisher obtained consent to search the car from the taxicab driver. He did not ask either of the passengers for consent. Deputy Fisher watched as Deputy Barton conducted the search, finding a bag with a shirt wrapped around it. Deputy Fisher stated that inside the bag were items used in the manufacture of methamphetamine, although he could not recall what specific items were in the bag. Palmer and the female passenger were then placed under arrest.

Deputy Fisher stated that by this time, Deputy Hughes had been picked up from his initial surveillance site and dropped off where the taxicab had been stopped. Deputy Fisher said that Deputy Hughes informed Palmer and the female passenger of their Miranda rights and questioned them further. According to Deputy Fisher, Palmer said that the items in the bag were his and did not belong to the woman. The woman claimed not to know anything about the items. Deputy Fisher testified that both said that they were methamphetamine addicts.

On cross-examination, Deputy Fisher testified that fifteen to thirty minutes passed between when he initiated the stop of the taxicab and when he obtained the driver's consent to search. He said that he activated the blue lights on his patrol car to initiate the stop and that he had not noticed the car violating any traffic laws. He testified that his reason for making the stop was that the taxicab was the only car in the area where Deputy Hughes had been observing. He further testified that he wanted to verify that Palmer was in the vehicle and to search to learn if the items the informant had mentioned were in the vehicle. He stated that four officers eventually came to the location of the stop.

Deputy Stoney Hughes of the Dyer County Sheriff's Department testified that on October 28, 2009, Deputy Fisher told him about a call from an informant. Deputy Fisher told him that the informant said Palmer hid some materials used to manufacture methamphetamine at a fence "at the first curve south of Fowlkes . . . right there next to the road" and would be coming during the night to pick them up. Deputy Hughes went with Deputy Fisher to the location at approximately 11:00 p.m. and hid in a treed area about twenty-five yards off the road. He said that the wooded area extended to within five to ten yards of the curve in Old Fowlkes Road. Deputy Hughes described the grass in the area around the fence as "boot high." He said that the grass was wet with a "very heavy dew." He described the area on the opposite side of Old Fowlkes Road as a cotton field.

-4-

He testified that as he walked to his hiding spot, he noticed a white, five-gallon bucket lying on the ground. Deputy Hughes described the bucket's open end as angling away from the fence toward the southwest. Deputy Hughes did not investigate the bucket at the time because the informant indicated that Palmer could be at the location soon, and he did not want to be seen with his flashlight looking in the area.

Deputy Hughes hid for approximately two hours until a few minutes past 1:00 a.m., at which time someone approached the fence "right up to where the area where the bucket was." Deputy Hughes could not see the person's face, but observed that the person was a male based on the size of the figure.[2] As the person reached the fence, Deputy Hughes received a call over his radio, which he had failed to turn off. The person then left abruptly. Deputy Hughes was "fairly certain the subject heard the radio traffic." Deputy Hughes exited his hiding place. Although the person had left the area already, Deputy Hughes noticed tracks in the grass on the other side of Old Fowlkes Road, leading toward the northeast and the cotton field.

Deputy Hughes called Deputy Fisher, who drove to the area. Deputy Hughes continued watching the area. He stated that about seventy-five yards to the north of him was a row of houses, where the area was lit. He saw a car traveling toward him, southbound, on Old Fowlkes Road. The car stopped near the houses, and Deputy Hughes saw a dark figure leave the cotton field area and enter the car. Deputy Hughes contacted Deputy Fisher again. Deputy Hughes maintained sight of the car until Deputy Fisher approached it. While Deputy Hughes waited for someone to pick him up, he noticed that the bucket was facing a different direction. Deputy Hughes testified that he communicated all this to Deputy Fisher before Deputy Fisher stopped the car.

Throughout this portion of Deputy Hughes' testimony, he marked a map with the locations of his hiding spot, the bucket, the cotton field, and where the figure left tracks into the cotton field and later emerged to enter the car. The map was admitted at the hearing as exhibit 1. Deputy Hughes stated that Lieutenant Simpson later picked him up and took him to where Deputy Fisher had stopped the car. By the time Deputy Hughes arrived, the other officers had searched the car. Deputy Hughes advised Palmer of his Miranda rights, and Palmer stated that the items found in the car belonged to him. On cross-examination, Deputy Hughes testified that he searched the area where the bucket was after the person left, but he

---

[2] The trial court's order denying Palmer's motion to suppress states that the parties reviewed off the record a tape of the preliminary hearing in Palmer's case. The parties agreed that Deputy Hughes testified in the preliminary hearing that he could not identify the gender of the figure. The trial court does not further comment on how, in the court's view, this affects Hughes' credibility for the purposes of the suppression hearing.

did not find anything. He stated that he was unable to maintain constant sight of the figure between the time the figure left the fence and when he saw the figure enter the car.

Deputy Phillip Barton of the Dyer County Sheriff's Department testified that he was present at the scene of the traffic stop at Highway 51 and Samaria Bend. He heard Deputy Fisher interview Palmer. Deputy Barton testified that Palmer initially responded to questioning by saying, "[W]hat are you putting on me[?] I know stuff. I can help you out." Deputy Barton said that Palmer had not been accused of anything when he said this. Palmer denied getting methamphetamine components from the side of the road.

Deputy Barton spoke with the taxicab driver and requested permission to search the car, which was provided. Deputy Barton said that the driver, at the time of the request for permission, was in a patrol car although the driver was not in custody. Barton explained that the driver was in the car for safety reasons, as they were on the side of the road, and because it was a cold night. When Deputy Barton searched the taxicab, he found a yellow Dollar General plastic bag in the right rear passenger floorboard, pushed under the seat. When he opened the bag, Deputy Barton found a plaid shirt with other items inside it, including a twenty-ounce Sprite bottle with tubing attached to the top and a metal filter on the side of the cap. Deputy Barton testified that this item is called a "gas generator" and is used in the manufacture of methamphetamine. Deputy Barton also found a two-liter Sprite bottle with a yellow, ammonia-based liquid inside. Barton testified that ammonia is used to start the manufacture process. He found two pieces of aluminum foil, each twelve inches by twelve inches. Deputy Barton stated that this is used in the methamphetamine manufacturing process by placing it "in the gas generator along with the sulfuric acid . . . or the hydrochloric acid to create the gas generation that you need to make meth." He found a green plastic cup with coffee filter material, ashes, and white residue inside. Deputy Barton believed this was used as a filter for liquid poured into the cup. He also found two mason jars, a quart jar and a pint jar. He testified that these are typically used for measuring during the manufacture process.

Gary Bennett testified that he was driving a taxicab for Triple T Taxi Service on the evening in question. He received a call to pick up two people at a particular address, which was not provided at the hearing. Mr. Bennett testified that the people got in his taxicab, told him they wanted to go to the Executive Inn, and would pay Mr. Bennett upon arrival at their destination. After being stopped by the police, Mr. Bennett provided an officer with consent to search the taxicab. He testified that he was not threatened or coerced, and he gave his permission freely. Mr. Bennett confirmed that he was in the backseat of a patrol car while the search of his cab was conducted. He was not handcuffed, was comfortable in the patrol car, and stated that it was warmer than being outside.

-6-

Following the suppression hearing, the trial court filed an order denying Palmer's motion. The court determined that the officers had probable cause or reasonable suspicion to stop the taxicab. The court found that the taxicab driver voluntarily consented to the search of the car. Furthermore, the court ruled that Palmer did not have standing to challenge the search of the taxicab.

## ANALYSIS

Palmer claims that the Dyer County Sheriff's Department lacked reasonable suspicion to stop the taxicab because the informant's tip did not demonstrate the informant's credibility or basis of knowledge. He argues that the stop was illegal, and the driver's consent to search was not sufficiently attenuated from the illegal stop. As a result, the evidence obtained against Palmer during the search was fruit of the illegal stop and should be excluded. In response, the State argues that the trial court properly denied the motion to suppress. The State contends that the officers had reasonable suspicion sufficient to justify the stop of the taxicab based on the tip and the officers' observations. Consequently, the State argues that evidence obtained following a consensual search was admissible against Palmer. Upon review, we agree with the State.

**Standard of Review**. The standard of review applicable to suppression issues involves a mixed question of law and fact. State v. Garcia, 123 S.W.3d 335, 342 (Tenn. 2003). "[A] trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Cox, 171 S.W.3d 174, 178 (Tenn. 2005) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). The Tennessee Supreme Court explained this standard in State v. Odom:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld.

Odom, 928 S.W.2d at 23.

**Investigatory Stop of Vehicle**. We begin by addressing the question of the legality of the stop, as all of Palmer's arguments are premised on its illegality.

The Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect against unreasonable searches and seizures. The stop of a vehicle and the detention of its occupants constitutes a seizure within the meaning of both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution. Whren v. United States, 517 U.S. 806, 809-10 (1996); State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000). Both driver and passenger alike are seized and may challenge the propriety of the stop. Brendlin v. California, 551 U.S. 249, 255-58 (2007).

A warrantless search or seizure "is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997). A warrant is not required for an investigatory stop if the officer has "a reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed." State v. Bridges, 963 S.W.2d 487, 492 (Tenn. 1997) (citing Terry v. Ohio, 392 U.S. 1, 21 (1968)). Probable cause is not required for an investigatory stop. State v. Coleman, 791 S.W.2d 504, 505 (Tenn. Crim. App. 1989) (citing Terry, 391 U.S. at 27 and Hughes v. State, 588 S.W.2d 296, 305 (Tenn. 1979)).

The Tennessee Supreme Court has stated that a "[r]easonable suspicion is a less demanding standard than probable cause." Bridges, 963 S.W.2d at 492 (quoting Alabama v. White, 496 U.S. 325, 330 (1990)). Reasonable suspicion for an investigatory stop will be found to exist only when the events which preceded the stop would cause an objectively reasonable police officer to suspect criminal activity on the part of the individual stopped. State v. Levitt, 73 S.W.3d 159, 172 (Tenn. Crim. App. 2001); State v. Norword, 938 S.W.2d 23, 25 (Tenn. Crim. App. 1996). The likelihood of criminal activity required for reasonable suspicion is not as great as that required for probable cause, and is "considerably less" than would be needed to satisfy a preponderance of the evidence standard. United States v. Sokolow, 490 U.S. 1, 7 (1989); see also State v. Keith, 978 S.W.2d 861, 867 (Tenn. 1998).

Reasonable suspicion necessary to stop a vehicle can also arise from an informant's tip. State v. Simpson, 968 S.W.2d 776, 781 (Tenn. 1998) (citing State v. Pulley, 863 S.W.2d 29 (Tenn. 1993)). However, when reasonable suspicion is based on a confidential informant's tip, where there is a high risk of false reports, there must be a showing of the informant's "veracity or credibility and basis of knowledge." Id. (citing Pulley, 863 S.W.2d at 31; State v. Jacumin, 778 S.W.2d 430, 436 (Tenn. 1989)). Police corroboration can offset deficiencies in either prong. Id. (citing Pulley, 863 S.W.2d at 31). Nevertheless, each prong must be separately considered and satisfied. Id. (citing Pulley, 863 S.W.2d at 31).

Comparing the standard of reasonable suspicion with probable cause in the context of this two-pronged analysis, the Tennessee Supreme Court has stated:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause. In other words . . . the two-pronged test of reliability need not be as strictly applied if the informant's tip is being used to establish reasonable suspicion rather than probable cause.

Id. at 781-82 (internal citation and quotation omitted). The circumstances under which the tip is given should be considered in assessing its reliability. Id. at 782. Furthermore, the "content, quality, and quantity of the information possessed by police must be assessed in determining whether it is sufficiently reliable to support a finding of reasonable suspicion." Id.

Palmer argues that the stop was not based on reasonable suspicion and was therefore illegal. He maintains that the tip lacked indicia of both credibility and basis of knowledge under the two-pronged test, and it was therefore an insufficient basis for reasonable suspicion. Regarding credibility, Palmer asserts that the police did not corroborate enough details to establish the informant's credibility. He argues, "The only fact that could be considered corroborating in this case is that Deputy Hughes spotted someone approaching his watch position at the outside limits of the time given by the informant." Other details, including the person's gender, Palmer's identity, and the presence of materials used to manufacture methamphetamine, were not corroborated. Regarding the informant's basis of knowledge, Palmer argues that Deputy Fisher expressly conceded that the informant did not provide any basis of knowledge for the tip and that this was Fisher's first time discussing such matters with the informant. Palmer also distinguishes cases in which an eye-witness basis of knowledge was inferred from the close temporal proximity of the tip and either the police corroboration of it or the occurrence of the criminal acts. See Simpson, 968 S.W.2d at 782-83. Here more than two hours separated the tip and its corroboration or the criminal acts it predicted, and there was no eye-witness basis of knowledge. Consequently, Palmer argues, the tip did not provide the police with reasonable suspicion sufficient to stop the taxicab.

Palmer further asserts several reasons that reasonable suspicion did not exist based on any other factors aside from the tip. The taxicab did not violate any traffic laws. Deputy Fisher did not directly observe the person who approached the fence enter the taxicab. None

of the officers testified as to "why it would be reasonable to believe a methamphetamine manufacturer, or Mr. Palmer specifically, would have items necessary to produce methamphetamine placed near a fence line outside." None of the officers testified as to the character of the area.

The State concedes that "there may have been some initial questions concerning the informant's reliability." However, the State asserts that the totality of the circumstances provided the officers with reasonable suspicion:

> [T]he officers [sic] knowledge of the defendant, the subsequent confirmation of the informant's information and surveillance of the location along with the defendant's suspicious behavior, i.e., walking in that remote location in the early morning hours and running away when he heard the officers's radio, all create sufficient reasonable suspicion that a crime has been or was about to occur, and therefore, provided a legal basis for the officers to stop the taxi.

Regarding this issue, the trial court rejected Palmer's arguments challenging the basis of the stop. The court ruled, "Obviously, the tip by itself would not create probable cause or reasonable suspicion to make the stop. The tip from the confidential informant, however, along with the observations of Deputy Hughes and Deputy Fisher, does create probable cause or reasonable suspicion to make the stop."

In this case, the evidence does not preponderate against the denial of the motion to suppress on the grounds that the stop was illegal. The trial court found that Deputy Fisher had reasonable suspicion sufficient to initiate a stop of the taxicab.[3] The record supports this determination. Deputy Fisher testified that he received a tip from an informant, known to him, which he considered reliable based on the specificity of the tip and his familiarity with Palmer's record for methamphetamine-related crimes. He and Deputy Hughes then corroborated details of the tip, including the very specific location of the items along Old Fowlkes Road and the timing of Palmer's retrieval of those items. Furthermore, the officers observed behavior that made them suspect criminal activity was occurring. Deputy Hughes watched a figure approach a dark, wooded area along the side of the road during the middle of a damp, cold night. At the sound of a police radio, the person fled into a cotton field, emerging farther up the road to enter a taxicab. Deputy Fisher was aware of all these facts when he initiated the stop of the taxicab. The testimony at the suppression hearing therefore established that Deputy Fisher had a reasonable suspicion to stop the taxicab.

---

[3] Although the trial court found that officers had either probable cause or reasonable suspicion to make the stop, we need only address the existence of reasonable suspicion, the requirement for an investigatory vehicle stop.

Palmer mistakenly relies on State v. Fred Arthur Stier, No. W1999-600-CCA-R3-CD, 2000 WL 364833 (Tenn. Crim. App., at Jackson, Apr. 7, 2000), in arguing that Deputy Fisher lacked reasonable suspicion necessary to stop the taxicab. In Fred Arthur Stier, this Court considered whether a particular informant's tip created reasonable suspicion to stop a vehicle. Id. at *1-2. The State conceded error, and we concluded that the tip was not sufficiently reliable to support the stop and search of the defendant. Id. at *5. In Fred Arthur Stier, the police received a tip from a confidential informant that Stier "would possibly be carrying some cocaine to the Henry County area" on February 20, 1998. Id. at *1. The police received the tip on either February 18 or 19. Id. The tip contained a description of the car Stier would be driving, his license plate number, his direction of travel, and an approximate time he would be in Henry County. Id. The informant did not state his basis of knowledge. Id. at *5. Based on the tip, officers located Stier, in the car as described, parked at a bank in Henry County around 1:00 p.m. on February 20. Id. at *1. Soon after, Stier was stopped and arrested on drug charges. Id. at *2.

Applying the two-pronged reliability analysis, this Court found that neither prong was satisfied because no evidence of the informant's credibility or basis of knowledge was presented before the trial court. Id. at *5. Additionally, the scant police corroboration of Stier's presence in Henry County in the middle of the afternoon in the car that the informant described did not offset the deficiencies in the reliability analysis. Id. This Court described the corroborated facts as "innocent in and of themselves" because they involved only Stier's location on a particular day and possession of a particular car. Id. Consequently, we ruled that the tip did not provide reasonable suspicion sufficient to stop Stier. Id.

Here, Palmer argues that the facts leading to the stop of the taxicab are analogous to the facts of Fred Arthur Stier because there has been no showing of the informant's credibility and basis of knowledge. Palmer further argues that the police corroboration of the informant's tip here, as in Fred Arthur Stier, was merely of the defendant's location at a certain time, which is inadequate to make up for the deficiencies in the informant's credibility and basis of knowledge.

Fred Arthur Stier is distinguishable from the facts of this case based on the degree of corroboration and additional police observation. Palmer is correct to argue that the tip alone cannot satisfy the two-pronged analysis. Despite the corroboration of the details of the tip leading to satisfaction of the credibility prong, we agree with Palmer, and conclude that there has been no showing of the informant's basis of knowledge. However, contrary to Fred Arthur Stier, the officers here stopped the taxicab after corroborating substantial details of the tip and independently observing suspicious behavior. Specifically, Deputies Fisher and Hughes corroborated the specific location of the items hidden along Old Fowlkes Road and the presence of someone at that location during the middle of the night. In addition, the

police observed behavior that independently contributed to a reasonable suspicion that criminal activity was occurring. A person approached a fence along the side of the road in a rural area during the middle of the night where the bucket was hidden, the person fled into a cotton field at the sound of Deputy Hughes' radio, the person moved the hidden bucket and left it empty before fleeing, and the person entered a taxicab and departed the area. Although we consider this a close question, under the totality of the circumstances as reflected by the record, including the tip and the additional observations, the officers had reasonable suspicion sufficient to justify the stop of the taxicab. The stop therefore complied with the requirements of the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution. Palmer is not entitled to relief.

Finding that the stop was legal, we need not consider any of the other questions Palmer reserved for review. All of Palmer's additional arguments challenging the trial court's denial of his motion to suppress are premised on a finding that the stop was illegal. Because we find the stop was legal, none of these arguments are further applicable.

## CONCLUSION

Based on the foregoing reasons, we affirm the judgment of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE

-12-