# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT KNOXVILLE

## OCTOBER SESSION, 1999

**FILED**

December 29, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | **C.C.A. NO. 03C01-9812-CR-00424** |
| | ) | |
| Appellee, | ) | |
| | ) | |
| | ) | **HAMILTON COUNTY** |
| **VS.** | ) | |
| | ) | **HON. DOUGLAS A. MEYER,** |
| **DON PALMER BLACK,** | ) | **JUDGE** |
| | ) | |
| Appellant. | ) | **(DUI-Second Offense)** |

## ON APPEAL FROM THE JUDGMENT OF THE
## CRIMINAL COURT OF HAMILTON COUNTY

FOR THE APPELLANT:      FOR THE APPELLEE:

JERRY H. SUMMERS        PAUL G. SUMMERS
500 Lindsay Street           Attorney General and Reporter
Chattanooga, TN 37403-3496

                                MARVIN S. BLAIR, JR.
                                Assistant Attorney General
                                425 Fifth Avenue North
                                Nashville, TN 37243

                                BILL COX
                                District Attorney General

                                DEAN FERRARO
                                Assistant District Attorney General
                                City and County Court Building
                                Chattanooga, TN 37402

OPINION FILED _____

**AFFIRMED**

**DAVID H. WELLES, JUDGE**

# OPINION

The Defendant, Don Palmer Black, appeals as of right his conviction pursuant to a Hamilton County jury verdict finding him guilty of second offense driving under the influence of an intoxicant. He raises the following four issues for review:

> I. Whether the trial court erred in not finding the Defendant's stop to be illegal when the reasonable suspicion supporting the stop consisted solely of weaving within the confines of a single lane and when no traffic violation occurred.

> II. Whether the conviction should be reversed because the evidence was insufficient to support a guilty verdict since no rational trier of fact could have found that the Defendant was intoxicated to the point that his driving was impaired.

> III. Whether the trial court erred in not allowing the Defendant to assert the invalidity of his prior 1988 DUI conviction in this proceeding when State v. McClintock is no longer valid law after the 1996 amendments to the Post-Conviction Procedure Act.

> IV. Whether the trial court erred in not allowing the Defendant to suppress evidence that he had not taken a chemical test because the implied consent form was vague and failed to apprise the Defendant of the significant consequences of not taking the chemical test.

The only two witnesses at trial were Officer Robert Starnes of the Hamilton County Sheriff's Department and the Defendant. Officer Starnes testified that on December 17, 1994, he was a patrolman on the DUI task force in Hamilton County, and his job was to travel around Hamilton County to look for people who were driving under the influence. Shortly before 12:54 a.m. on December 17, 1994, Officer Starnes observed a 1975 GMC pickup truck traveling westbound on Brainerd Road in Hamilton County. He gave the following account of what he observed:

> The vehicle was driving in the far right-hand lane over near the curb line, and the vehicle was driving all over that one lane.
>
> On one or two occasions I observed the vehicle almost actually strike the right edge or curb of the edge of the roadway. This seemed very peculiar to me at this time, and this vehicle for no other apparent reason -- a dog hadn't run out in front of the car, it didn't appear any other reason, the brake lights didn't come on, any other reason why the vehicle should swerve over toward the right side of the curb, so I – to check the driver out to verify if everything was okay, I activated my emergency equipment, which included blue lights and siren, to pull the person over to make sure everything was okay.

While Officer Starnes testified that the vehicle was swerving to the right, he stated that the vehicle did not leave its lane of traffic. He activated his lights, and when he got no response from the vehicle, he activated his siren. The vehicle pulled over to the right-hand side of the road and up and over the sidewalk.

After this testimony, counsel for the Defendant moved to suppress the stop of the Defendant's vehicle based on a lack of reasonable suspicion to make the stop. During a jury-out hearing, Officer Starnes again explained why he stopped the vehicle:

> The vehicle, I observed the vehicle traveling westbound. The vehicle was weaving in that lane, in the right-hand lane, and the vehicle almost struck the curb on the right edge of the road twice, and that was my primary reason to investigate, stop the driver, see if there was possibly a problem why he was swerving toward the curb, because I didn't see him apply for his brakes [sic] or anything of that nature or any dog or anything run out in front of him to cause him to go to the right.

The trial court expressed reservations about the stop, but reserved ruling on the issue until after the trial.

Again before the jury, Officer Starnes testified that as he approached the vehicle, the Defendant exited the vehicle, and Starnes observed that the Defendant was "very unsteady on his feet." Officer Starnes asked for the

Defendant's driver's license, which the Defendant produced, though he "fumbled excessively" getting the license. Officer Starnes stated that he noticed a very strong odor of an alcoholic beverage coming from the Defendant's person as well as coming from the vehicle. He also noticed that the Defendant's eyes appeared to be "bloodshot and glassy."

Officer Starnes testified that he asked the Defendant to perform some field sobriety tests and asked the Defendant if he had any conditions which might impair his ability to perform the tests. The Defendant replied that he was blind in his right eye. Officer Starnes then had the Defendant perform the "one-leg stand" and the "walk and turn" tests, which the Defendant failed. On cross-examination, defense counsel directed Officer Starnes' attention to a student manual which the officer used to teach other officers how to detect DUI offenders. Officer Starnes admitted that the manual states that for the field sobriety tests to be valid, they must be administered in the prescribed, standardized manner and that if any one of the standardized field sobriety test elements is changed, the validity is compromised. He also acknowledged that according to the manual, "[p]ersons who cannot see out of one eye may . . . have trouble with [the walk and turn] test because of poor depth perception."

Officer Starnes arrested the Defendant and took him to the Hamilton County Jail. Once at the jail, Officer Starnes requested that the Defendant submit to a chemical test to determine the alcohol content of his blood. The Defendant refused to submit to the test and signed the standard implied consent form in use at the time.

The Defendant testified that his right eye is a glass eye, which he has as a result of an accident with an aerosol can. He said that his eyes naturally become red every day, and he had his glass eye painted red so that it would match his other eye. He takes two medications for seizures three times a day. He stated that he is not supposed to drink alcohol with his medication, but on the evening in question, he decided to have a drink because he had not taken his evening dose. He had a scotch and water with his dinner at a restaurant in Chattanooga. He stated that after dinner, he was going home when he saw a friend of his pulling into the parking lot of a bar. The Defendant followed his friend and went into the bar to buy his friend a Christmas drink. He said that he ordered a drink for himself, but drank only about two sips of it.

After leaving the bar, the Defendant was going home. He said that he was driving in the right-hand lane of Brainerd Road and that he did not know Officer Starnes was behind him until he heard the siren. He testified that the siren "scared me to death," so he pulled over and got out of the officer's way so that the officer could go around him. He stated that when he was stopped, he had not done anything wrong, and he did not believe his driving abilities were impaired in any way.

The Defendant further testified that as he was pulling over to the side of the road, he had a "mini seizure" triggered by being startled, which lasted only a rew seconds. He explained that such a seizure "makes you floppy." He stated, "Your arms will hurt and you're - - you just don't operate right." When asked to take the breathalyser test, the Defendant refused because he had been told that "those machines . . . aren't accurate."

-5-

The jury returned a verdict finding the Defendant guilty of second offense driving under the influence. The trial court then sentenced the Defendant to eleven months, twenty-nine days incarceration, with all but forty-five days suspended, as well as fifty days of community service. After the trial, the Defendant again challenged the legality of the stop of his vehicle. The trial court upheld the stop stating, "I'm going to rule against [the Defendant] for one reason: On a factual basis, that articulable suspicion is increased when he failed to stop in a half a mile, so that strengthens the articulable suspicion." The court went on to explain, ?I'm finding there was an articulable suspicion to stop him, based on the fact that he was weaving in that lane, almost hit the curb a couple of times. . . . But the fact it took him a half a mile to stop I think is the clinching point."

## I. MOTION TO SUPPRESS

On appeal, the Defendant once again challenges the initial stop of his automobile, arguing that the evidence discovered as a result of that stop should have been suppressed. When reviewing the grant or denial of a motion to suppress,

> [q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld. In other words, a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.

State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). However, the application of the law to the facts as found by the trial court is a question of law which the appellate court reviews de novo. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)

(citing Beare Co. v. Tennessee Dept. of Revenue, 858 S.W.2d 906, 907 (Tenn. 1993)). In upholding the stop of the Defendant's automobile, the trial court accredited Officer Starnes' testimony that the Defendant was weaving within his own lane of traffic and that he swerved to the right twice and almost hit the curb of the roadway. Thus, we must determine whether these facts justified the stop of the Defendant's automobile.

The stop of an automobile and the detention of its occupants constitutes a seizure, calling into play the protections of the United States and Tennessee Constitutions, even if the purpose of the stop is limited and the detention is brief. See Wren v. United States, 517 U.S. 806, 809-10 (1996); Delaware v. Prouse, 440 U.S. 648, 663 (1979); State v. Vineyard, 958 S.W.2d 730, 734 (Tenn. 1997). Thus, to justify the seizure of an automobile, an officer must at least have reasonable suspicion, based on specific and articulable facts, that the occupants have been involved in or are about to be involved in criminal activity. See Ornelas v. United States, 517 U.S. 690, 693 (1996); Prouse, 440 U.S. at 663; State v. Simpson, 968 S.W.2d 776, 780 (Tenn. 1998); Vineyard, 958 S.W.2d at 734. "Reasonable suspicion" is an objective standard, to be determined by the totality of the circumstances. United States v. Cortez, 449 U.S. 411, 417-18 (1981); State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992). Relevant factors to consider include the officer's personal observations, information obtained from other police officers or agencies, information obtained from citizens, and the pattern of operation of certain offenders. Simpson, 968 S.W.2d at 783; Watkins, 827 S.W.2d at 294; Cortez, 449 U.S. at 418. A court must also consider the rational inferences and deductions that a trained officer may draw from the facts and circumstances known to him or her. Id.

When an officer turns on his blue lights, he has initiated a stop or seizure of an automobile. State v. Pully, 863 S.W.2d 29, 30 (Tenn. 1993). Therefore, an officer must have reasonable suspicion to stop the vehicle before turning on the blue lights. Consequently, we must only consider the Defendant's actions prior to the time Officer Starnes turned on his blue lights, even though the trial court upheld the seizure of the Defendant's vehicle based on both the Defendant's driving before the stop and the Defendant's failure to respond immediately to the officer's instigation of a stop.

In this case, the Defendant was weaving within his own lane of traffic, and he swerved to the right twice, almost hitting the curb of the roadway. In the words of Officer Starnes, he was "driving all over that one lane." Such phenomena has been described in other cases we have considered. In State v. Stuart Allen Jenkins, C.C.A. No. 01C01-9712-CR-00590, 1998 WL 917806 (Tenn. Crim. App., Nashville, Dec. 21, 1998), the defendant's vehicle was seized after an anonymous informant reported the vehicle's license number to police and told police that the vehicle contained a possible drunk driver. Then, an officer matched the license number to the vehicle and observed the vehicle "weaving excessively in the roadway." Id. at *2. After considering the credibility and reliability of the informant, we stated, "[f]inally, the weaving observed by Trooper Bass, albeit within the defendant's lane of traffic, is another circumstance that lends credence to the potential for a drunk driver as stated by the informant." Id. at *4. In State v. Donnie Ray Loden, C.C.A. No. 03C01-9311-CR-00380, 1995 WL 23351 (Tenn. Crim. App., Knoxville, Jan. 19, 1995), we upheld the trial court's finding of reasonable suspicion when the defendant's vehicle was observed "weaving extremely bad [sic]" and "sort of hugging the while [sic] line

-8-

on the right and just weaving real bad [sic]." Id. at *1. The vehicle also "darted over" to enter the westbound ramp leading onto the interstate. Id. Similarly, in the case of State v. Guy Binette, C.C.A. No. 03C01-9802-CR-00075, 1999 WL 427606 (Tenn. Crim. App., Knoxville, June 28, 1999), we upheld the trial court's finding of reasonable suspicion when the officer observed the defendant's vehicle swerve and weave within its own lane, approach the dividing lines a number of times, and touch the center line at least twice.

After reviewing the law as applied in these cases, we believe the facts articulated by Officer Starnes are sufficient to establish reasonable suspicion that the Defendant was driving while under the influence. Not only did the Defendant weave within his lane, but he swerved twice, almost hitting the curb. The comment by Officer Starnes that the Defendant was "driving all over that one lane" indicates that the Defendant was weaving excessively. We conclude that this is evidence of erratic driving justifying the investigatory stop of the Defendant's vehicle.

While we uphold the stop of the Defendant's vehicle based on reasonable suspicion of criminal activity, we recognize the Defendant's concern that "a 'no weaving' rule could never have realistic boundaries [in] determining whether a stop would be permissible" and caution that we sanction no such rule. We realize that no driver drives perfectly at all times and that some movement inside a driver's own lane of travel is only natural and does not automatically constitute reasonable suspicion of criminal activity. There must be specific and articulate evidence of actions by a driver which would qualify as erratic driving, as opposed to mere inattention to detail and imperfection, before an investigatory stop is

justified based only on the manner of driving of a vehicle when no traffic laws have been violated.

## II. SUFFICIENCY OF THE EVIDENCE

Next, the Defendant challenges the sufficiency of the convicting evidence. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). Evidence is sufficient if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307 (1979). In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992) (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1976), and State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977)); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Holt v. State, 357 S.W.2d 57, 61 (Tenn. 1962).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914 (citing State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978)). The court may not "re-weigh or re-evaluate the evidence" in the record below. Evans, 838 S.W.2d at 191 (citing Cabbage, 571 S.W.2d at 836). Likewise, should the reviewing court

find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. Tuggle, 639 S.W.2d at 914.

Taking the evidence in the light most favorable to the State, the evidence shows that the Defendant was "driving all over" his lane of traffic, that he swerved twice and almost hit the curb, that he did not immediately stop his vehicle when Officer Starnes activated his lights, that when he did stop, he pulled his vehicle up and over the sidewalk, that he had a strong odor of alcohol about his person and his vehicle, that his "eye" appeared bloodshot and glassy, that he fumbled "excessively" for his driver's license, that he admitted drinking, that he failed two sobriety tests, and that he refused to take a breathalyser test. All of this evidence, taken together, is sufficient for a rational juror to find the Defendant's guilt beyond a reasonable doubt.

The Defendant makes a strong argument in which he attacks and attempts to undermine the sufficiency of all of this evidence by emphasizing both Officer Starnes' testimony and the Defendant's testimony, but the Defendant's attack goes to the credibility and weight of the evidence, which are matters for the determination of the jury. Because we cannot re-weigh the evidence or re-evaluate the witnesses' credibility and because we are required to resolve conflicts in testimony in favor of the jury verdict, we must accept the State's evidence. Accordingly, we find that the evidence supports the verdict rendered by the jury and uphold that verdict.

### III. ATTACK ON PRIOR DUI

The Defendant argues that the trial court erred in not allowing him to assert the invalidity of his facially valid prior 1988 DUI conviction in this proceeding. He asserts that State v. McClintock, 732 S.W.2d 268 (Tenn. 1987), which prohibits collateral attacks on facially valid judgments in subsequent proceedings in which the challenged convictions are used to enhance punishment, is no longer valid law after the 1986 and 1995 amendments to the Post-Conviction Procedure Act, which placed a statute of limitations on the filing of a post-conviction petition. We previously considered and rejected this precise argument in the case of State v. Phillip Todd Swords, C.C.A. No. 03C01-9807-CR-00239, 1999 WL 222702, *6-7 (Tenn. Crim. App., Knoxville, Apr. 14, 1999), in which we stated,

> According to our supreme court in State v. McClintock 732 S.W.2d 268 (Tenn. 1987), "The rule has been firmly established in Tennessee that a facially valid, unreversed judgment in a court with jurisdiction over the subject matter and the person cannot be collaterally attacked in a subsequent proceeding except by the authorized routes of attack." We decline to hold the rule announced in McClintock unconstitutional following institution of a statute of limitations for post-conviction petitions, as Defendant requests that this Court hold.

Id. at *6 (quoting McClintock, 732 S.W.2d at 272). Accordingly, this issue has no merit.

### IV. VALIDITY OF IMPLIED CONSENT FORM

In his final issue, the Defendant argues that the trial court erred in not suppressing evidence that he refused to submit to a chemical test to determine the alcohol content of his blood. He asserts that the evidence should have been suppressed because the implied consent form that was used to obtain his refusal was vague and failed to inform him of the significant consequences of refusing or submitting to such a test.

In the case of State v. Whaley, 982 S.W.2d 346, 349 (Tenn. Crim. App. 1997), we considered the issue of whether the implied consent form was vague or misleading as applied to a person who submitted to the test. In that case, the defendant submitted to the breathalyser test and then subsequently argued that the results should have been suppressed because the implied consent form was unconstitutionally vague and misleading in that it failed to inform her of the consequences of submitting to the test. We noted that the form clearly indicated that the purpose of the test is to determine the drug and alcohol content of the accused's blood and that the average person would understand that the results will be used against him. If the test could not be used to prosecute the person for the crime charged, then there would be no purpose for administering the test. Id. In addition, we recognized the prior holding by this Court that "admonitions prior to submitting to a blood alcohol test are not required to sustain a valid consent." Id. (citing King v. State, 598 S.W.2d 834, 835 (Tenn. Crim. App. 1980)). Therefore, we found the form to be neither vague nor misleading. Id.

Similarly, we do not find the form to be vague or misleading as applied to a person who refuses to submit to the test. As required by Tennessee Code Annotated § 55-10-406(a), the consent form signed by the Defendant informed him that he could refuse the test, but that if he refused, his driver's license would be suspended. Though the form did not tell him that his refusal could be used against him as an inference of guilt, we believe that an average person would understand that that could be a possible result of refusal. Nothing on the form could have caused him to believe that his refusal would not have been used against him. In addition, "nothing in the statute requires that a driver be given Miranda-like admonitions" prior to requesting consent to perform such a test.

See <u>King</u>, 598 S.W.2d at 835. We therefore decline to hold that the implied consent form is constitutionally defective and instead hold that the Defendant's refusal to submit to the test was properly admitted into evidence. See <u>State v. Frasier</u>, 914 S.W.2d 467 (Tenn. 1996); <u>State v. Smith</u>, 681 S.W.2d 569, 570 (Tenn. Crim. App. 1984).

The judgment of the trial court is affirmed.

_____
DAVID H. WELLES, JUDGE

CONCUR:

_____
GARY R. WADE, PRESIDING JUDGE

_____
DAVID G. HAYES, JUDGE