IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 13, 2003 Session

## STATE OF TENNESSEE v. ANTONIO T. SEAY

**Appeal from the Criminal Court for Wilson County**
**No. 01-1540     John D. Wootten, Jr., Judge**

---

**No. M2002-02129-CCA-R3-CD - Filed July 11, 2003**

---

The defendant, Antonio T. Seay, pled guilty in the Wilson County Criminal Court to possession of a weapon by a convicted felon, a Class E felony, and the trial court sentenced him as a Range I, standard offender to one year in the Department of Correction. He appeals upon certified questions of law from the trial court's denial of his motion to suppress evidence that was seized pursuant to a stop and frisk. See T.R.A.P. 3(b); Tenn. R. Crim. P. 37(b). He claims that the trial court should have granted his motion because (1) a federal district court had granted his motion to suppress in an earlier federal proceeding and (2) the police lacked reasonable suspicion to stop him. We hold that the trial court was not bound by the federal district court's ruling and affirm the trial court's denial of the motion to suppress.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which DAVID H. WELLES and ALAN E. GLENN, JJ., joined.

Harry A. Christensen, Lebanon, Tennessee, for the appellant, Antonio T. Seay.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Tom P. Thompson, Jr., District Attorney General; and David E. Durham, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to a citizen's reporting to the police that a man with an assault rifle was crouching behind cars. At the suppression hearing, Jason Bowes testified that on March 13, 2000, he was working as a maintenance man for the Lebanon Housing Authority on Lake Street. He said that about 12:00 p.m., he was eating his lunch in the maintenance building and saw a white, middle to late 1980's Oldsmobile Cutlass drive to the back of the building. He said that an African-American male with an assault rifle jumped out of the car, squatted down, and pointed the rifle at a group of people. He said that the rifle was long and black and that he did not think it had a scope.

He said that he told his supervisor, who was in the building office, about what was happening outside and that his supervisor telephoned the police. He said that as he was observing the incident, he was describing it to his supervisor, who was about fifteen feet away, and his supervisor was telling the police. He said that the man got back into the white car and drove south on Lake Street.

On cross-examination, Mr. Bowes acknowledged specifying at a suppression hearing in federal district court that the car was an Oldsmobile Cutlass. He said, though, that "[it] was just basically a way to describe the car." He said that he did not have any military experience but that he had seen an automatic weapon before. He acknowledged knowing the difference between illegal and legal assault rifles but said he had never seen an automatic M-16 assault rifle, which is the illegal version of an AR-15 assault rifle. He said that the man pointed the rifle at the group of people for a few seconds and that the group was about one hundred yards away from the man. He said that he did not see anyone else in the white car and that, other than pointing the rifle at the group of people, he did not see the man commit a crime.

James Michael Montgomery testified that on March 13, 2000, he was the maintenance supervisor for the Lebanon Housing Authority. He said that about noon, Jason Bowes told him that an African-American male with an assault rifle was outside and "slipping in and out behind cars." He said that he telephoned the police; told the dispatcher, "This is Mike Montgomery from the Lebanon Housing Authority;" and reported what was happening. He said that as Mr. Bowes was describing the incident to him, he was telling the police dispatcher. He said that he gave the dispatcher a description of the car and told her that the car was traveling south toward the highway bypass. He said that he was on the telephone with the dispatcher for a few minutes and that he did not see any part of the incident. He said that during the twenty-one years he had worked for the Lebanon Housing Authority, he had telephoned the police hundreds of times in order to report suspected criminal activity.

Dawna Gutierrez testified that on March 13, 2000, she was the Lebanon Police Department's dispatch supervisor. She said that at 11:58 a.m., she received a telephone call from James Michael Montgomery. She said Mr. Montgomery told her that an African-American male with an assault rifle was driving a white, 1987 Buick south on Lake Street toward the highway bypass. She said that while she was on the telephone with Mr. Montgomery, she dispatched officers to the area and that Officer Koy Lafferty, who was driving on the bypass, responded to the call. On cross-examination, she said that according to her records, Mr. Montgomery reported that the car was a white Buick, not a white Oldsmobile. She said that after Officer Lafferty stopped the defendant's car, he radioed to her that it was an Oldsmobile. She said that Officer Lafferty had the defendant in custody by 12:03 p.m.

Officer Koy Lafferty of the Lebanon Police Department testified that on March 13, he was returning from lunch and driving toward the highway bypass when he received a be-on-the-lookout (BOLO) call for an African-American male driving a white, 1987 Buick. He said the dispatcher reported that the man had been walking around with an assault rifle. He said that seconds later, he saw a white Oldsmobile Cutlass traveling south on Lake Street. He said that although the dispatcher

had reported the suspect car was a Buick, the Oldsmobile Cutlass had a body style similar to a Buick and the cars looked the same.

Officer Lafferty testified that he turned around and began following the defendant. He said that the defendant stopped at a stop sign at the intersection of South Lake and Sycamore Streets and that a brown car was between his patrol car and the defendant's car. He said that two men got out of the brown car and ran west on Sycamore Street. He said that the defendant turned left onto Sycamore and drove east and that the brown car turned right. He said that he turned left and continued following the defendant. He said the defendant stopped at the corner of Cedar and Sycamore Streets, got out of the car, and walked toward an apartment building. He said that he pulled up to the defendant and told him to "stop, I need to talk to you." He said that the defendant turned his head and walked faster. He said that he got out of his patrol car and again told the defendant to stop. He said that the defendant stated, "No, I ain't done nothing;" walked up to an apartment door; and tried to open it. He said that he thought the defendant was trying to evade him and that he grabbed the defendant and told him to put his hands on a car that was parked in front of the building. Officer Lafferty said that for his safety, he handcuffed the defendant. He said he told the defendant that the defendant was not under arrest but that he needed to talk to the defendant. He said that he patted down the defendant and felt a pistol in the defendant's right front pocket. He said that the pistol was a nine millimeter and that it was loaded and the hammer was pulled back. He said that the Lake Street area is one of the highest crime areas in Lebanon.

On cross-examination, Officer Lafferty testified that he did not stop the defendant's car. He said that the defendant did not run from him but that the defendant refused to stop when he asked him to. He said that based upon the police dispatch and the defendant's behavior, he thought the defendant might be dangerous. He said he did not find a rifle in the defendant's car.

At the close of the hearing, the trial court made the following factual findings: Mr. Bowes saw a man point a weapon at a group of people and get into a white car that was similar to a middle to late 1980's Oldsmobile Cutlass. As Mr. Bowes watched the incident, he described it to Mr. Montgomery, who simultaneously reported it to the police. Within a few minutes, Officer Lafferty saw a single African-American male driving a white car south on Lake Street. Although Officer Lafferty tried to stop and talk to the defendant, the defendant moved away from him. The trial court determined that reasonable suspicion existed to stop the defendant and, therefore, that Officer Lafferty could pat him down. Accordingly, it denied the motion to suppress.

## I. COLLATERAL ESTOPPEL

The defendant claims that the trial court was required to grant his motion to suppress because earlier, a federal district court, under the same facts as those presented at the state evidentiary hearing, had suppressed the evidence. He argues that the federal court's prior determination prevented the state from relitigating the issue of whether reasonable suspicion existed to stop him. The state claims that the principle of dual sovereignty allowed the state to prosecute the defendant. We agree with the state.

As a result of the defendant's stop, the defendant was charged in federal court with being a convicted felon in possession of a weapon. He filed a motion to suppress the evidence that Officer Lafferty found during the stop, and on May 7, 2001, an evidentiary hearing was held in federal district court. At the close of the hearing, the federal court granted the defendant's motion on the basis that reasonable suspicion had not existed to support the stop. According to the defendant, the federal prosecutor did not appeal the court's decision, and the case was dismissed. On September 17, 2001, a Wilson County grand jury indicted the defendant for being a felon in possession of a handgun. The defendant argues that once he was charged with the crime, the Wilson County District Attorney stepped into the shoes of the federal prosecutor and the trial court became bound by the federal court's decision to grant the defendant's motion to suppress.

The doctrine of collateral estoppel in the criminal law stems from the constitutional protection against double jeopardy. Ashe v. Swenson, 397 U.S. 436, 445-46, 90 S. Ct. 1189, 1195 (1970); see State v. Allen, 752 S.W.2d 515, 516 (Tenn. Crim. App. 1988) (analyzing the application of collateral estoppel as defined in Ashe in a double jeopardy challenge under both the state and federal constitutions). This doctrine prevents relitigation of issues necessarily decided in an earlier trial: Collateral estoppel "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." Ashe, 397 U.S. at 443, 90 S. Ct. at 1194. The policy behind the doctrine lies in the inherent reliability of final judgments. Standefer v. United States, 447 U.S. 10, 23 n.18, 100 S. Ct. 1999 (1980) (noting that collateral estoppel "is premised upon an underlying confidence that the result achieved in the initial litigation was substantially correct"). On the other hand, the doctrine of dual sovereignty provides that "a federal prosecution does not bar a subsequent state prosecution of the same person for the same acts, and a state prosecution does not bar a federal one." United States v. Wheeler, 435 U.S. 313, 317, 98 S. Ct. 1079, 1082-83 (1978); see Lavon v. State, 586 S.W.2d 112 (Tenn. 1979) (upholding and adhering to the dual sovereignty doctrine). Moreover, "prosecutions under the laws of separate sovereigns do not . . . 'subject [the defendant] for the same offence to be twice put in jeopardy.'" Wheeler, 435 U.S. at 317, 98 S. Ct. at 1083. In Bartkus v. Illinois, 359 U.S. 121, 124, 79 S. Ct. 676, 678 (1959), the United States Supreme Court carved out an exception to the doctrine, stating that dual sovereignty may violate the principles of double jeopardy if "the state prosecution was a sham and a cover for a federal prosecution, and thereby in essential fact another federal prosecution."

Obviously, the doctrine of dual sovereignty mandates that even if the defendant had been tried and acquitted in federal court, he still could be tried and convicted in the Wilson County Criminal Court. Likewise, the fact that the federal court granted his motion to suppress has no effect on his prosecution in state court. Moreover, nothing in the record suggests, and the defendant does not argue, that the state and federal prosecutions had anything to do with each other. Thus, the Bartkus exception does not apply, and the defendant is not entitled to relief.

## II. REASONABLE SUSPICION

The defendant contends that the trial court erred by denying his motion to suppress because the arresting officer did not have reasonable suspicion to stop him. Specifically, he claims that reasonable suspicion did not exist because the Lebanon Police dispatcher failed to establish the informant's basis of knowledge and the arresting officer's personal observations did not verify any illegal conduct by the defendant. The state claims that reasonable suspicion existed because the arresting officer based the stop on information that had been given to the police dispatcher by a known citizen informant. We conclude that the trial court properly denied the defendant's motion.

In reviewing a trial court's denial of a motion to suppress, the defendant bears the burden of demonstrating that the evidence preponderates against the trial court's findings. State v. Odom, 928 S.W.2d 18, 22-23 (Tenn. 1996). The application of the law to the facts as determined by the trial court is a question of law which is reviewed de novo on appeal. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997). Further, questions of the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Id. at 628. The prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." Odom, 928 S.W.2d at 23.

The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures, and "Article 1, Section 7 of the Tennessee Constitution is identical in intent and purpose with the Fourth Amendment." State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997) (citation omitted). The Fourth Amendment requires officers to have reasonable suspicion that a crime has been or is about to be committed before seizing a citizen. State v. Daniel, 12 S.W.3d 420, 424 (Tenn. 2000).

> "Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause."

State v. Pulley, 863 S.W.2d 29, 32 (Tenn. 1993) (quoting Alabama v. White, 496 U.S. 325, 330, 110 S. Ct. 2412, 2416 (1990)). In determining whether an officer's reasonable suspicion is supported by specific and articulable facts, "a court should consider the totality of the circumstances--the entire picture." State v. Moore, 775 S.W.2d 372, 377 (Tenn. Crim. App. 1989) (citations omitted).

When a stop is based upon an informant's tip, the factors set forth in State v. Jacumin, 778 S.W.2d 430, 436 (Tenn. 1989), are used to determine whether the informant's tip established probable cause. Pulley, 863 S.W.2d at 31. In Jacumin, our supreme court adopted the two-prong test of Aguilar v. Texas, 378 U.S. 108, 84 S. Ct. 1509 (1964), and Spinelli v. United States, 393 U.S.

410, 89 S. Ct. 584 (1969). Jacumin, 778 S.W.2d at 436. In Aguilar, the United States Supreme Court concluded that there must be a "basis of knowledge" when an officer relies on an informant's tip. The "veracity" prong of the Aguilar-Spinelli test requires a showing that the informant is credible or the information is reliable. Although an investigatory stop based upon reasonable suspicion requires "'a lower quantum of proof than probable cause,'" the Jacumin factors are also useful in considering the reliability of an informant's tip for establishing reasonable suspicion. Pulley, 863 S.W.2d at 31. The Jacumin court held that

> while independent police corroboration could make up deficiencies in either prong, each prong represents an independently important consideration that "must be separately considered and satisfied in some way."

778 S.W.2d at 436 (quoting Commonwealth v. Upton, 476 N.E.2d 548, 557 (1985)); see Pulley, 863 S.W.2d at 31. "An officer may make an investigatory stop based upon a police dispatch as long as the individual or agency placing the dispatch has the requisite reasonable suspicion supported by specific and articulable facts that indicate criminal conduct." State v. Luke, 995 S.W.2d 630, 636 (Tenn. Crim. App. 1998).

Our supreme court has distinguished between information provided by a known citizen informant and that obtained from a criminal or professional informant. State v. Cauley, 863 S.W.2d 411, 417 (Tenn. 1993); State v. Melson, 638 S.W.2d 342, 354 (Tenn. 1982). Information supplied by a criminal informant must be analyzed under the Jacumin test, while the known citizen informant is presumed to be reliable. Cauley, 863 S.W.2d at 417. Citizen informants, whether they be victims or witnesses, have necessarily gained their information through first-hand experience. Melson, 638 S.W.2d at 354-56 (citations omitted). The criminal informant provides information in exchange for some consideration--whether it be monetary or the granting of some exemption or privilege--while the citizen informant acts in the interest of society or personal safety. State v. Smith, 867 S.W.2d 343, 347 (Tenn. Crim. App. 1993) (citing State v. Paszek, 50 Wis.2d 619, 184 N.W.2d 836, 842-43 (1971)). Nevertheless, "information about the citizen's status or his or her relationship to the events or persons involved" must still be present. Luke, 995 S.W.2d at 637.

In support of its argument that reasonable suspicion existed for Officer Lafferty to make the stop, the state claims that Luke is dispositive. In Luke, a hotel security guard told the hotel clerk that a man in a white Chevrolet pickup truck had just driven out of the hotel parking lot. The clerk telephoned the police and told the dispatcher her name and that she worked for the Holiday Inn. She then gave the dispatcher a description of the truck and told the dispatcher the truck's license tag number, the direction the truck was traveling, and that the driver "had no business driving." The dispatcher radioed to police officers information about the truck and the fact that its driver may be under the influence. As a result of the dispatch, an officer stopped and arrested the defendant. On appeal, the defendant claimed that the information the clerk gave to the dispatcher was not reliable because the clerk obtained it second-hand from the security guard rather than from her own personal observations. This court disagreed and held that reasonable suspicion existed for the stop because

the clerk, a known citizen informant, was presumed reliable even if she did not obtain the information through personal observation. Id. at 637.

In this case, the defendant claims that the state did not show a basis of knowledge for the citizen informant, Mr. Montgomery. We take the defendant's argument to be that because Mr. Montgomery did not tell the dispatcher from whom he got his information, he could not be presumed reliable like the clerk in Luke. However, in light of the trial court's findings, we believe that the court may well have inferred that the dispatcher was aware Mr. Montgomery was giving her second-hand information. In this respect, the defendant has failed to present evidence that preponderates against the trial court's inference.

Nevertheless, sufficient police corroboration at or near the time of the tip can satisfy Aguilar-Spinelli's basis of knowledge prong. See State v. Kelly, 948 S.W.2d 757 (Tenn. Crim. App. 1996); see also Jacumin, 778 S.W.2d at 436 (providing that independent police corroboration can make up for deficiencies in either prong of the Aguilar-Spinelli test). In this case, Mr. Montgomery telephoned the Lebanon Police Department at 11:58 a.m., and Dawna Gutierrez immediately radioed a BOLO for an African-American male driving a white 1987 Buick south on Lake Street toward the bypass. Within minutes, Officer Lafferty, who was in the bypass area, saw a single African-American male driving south on Lake Street. Officer Lafferty testified that the defendant was driving a white Cutlass and that a 1987 Oldsmobile Cutlass looked like a Buick. As for the timing, Ms. Gutierrez testified that Officer Lafferty had the defendant in custody by 12:03 p.m., five minutes after Mr. Montgomery telephoned the police. This was sufficient corroboration to make up for the deficiencies in the Aguilar-Spinelli test. Moreover, as in Pulley, we believe the potential for serious harm in this case justified the stop. See Pulley, 863 S.W.2d at 33 (stating that "the gravity of the perceived harm is a crucial element in assessing the reasonableness of an investigative Terry stop" and that "[t]his principle is reflected in the decisions of several jurisdictions which have justified the use of brief investigatory stops in cases involving anonymous tips of people carrying deadly weapons").

The defendant contends that even if Mr. Montgomery's tip to the dispatcher created reasonable suspicion to stop and question him, Officer Lafferty overreached his authority by handcuffing and patting him down. He argues that being handcuffed and patted down was unjustified because Mr. Montgomery's telephone tip had reported that the defendant was carrying a rifle and because the defendant obviously was not carrying a rifle when Officer Lafferty saw him get out of the white car. We agree that handcuffing the defendant was not justified by a reasonable suspicion to stop and question the defendant. However, we conclude that the handcuffing was irrelevant to the discovery of the pistol. A police officer may perform a protective frisk of a defendant if the officer has reasonable suspicion that the defendant is armed. Moreover, a "frisk has been upheld as reasonable when the suspected crime might typically involve the use of a weapon." State v. Winn, 974 S.W.2d 700, 703 (Tenn. Crim. App. 1998). In this case, Officer Lafferty testified that the dispatcher had reported that the defendant was walking around with an assault rifle. Given that information, it was not unreasonable for Officer Lafferty to infer that the defendant might have

a weapon on his person and conduct a protective pat-down of the defendant's clothing. The defendant is not entitled to relief.

Based on the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON, JUDGE