# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
May 17, 2011 Session

## STATE OF TENNESSEE v. BERNARDO ACUNA RODRIGUEZ

**Direct Appeal from the Circuit Court for Warren County**
**No. M12423      Larry B. Stanley, Judge**

**No. M2010-02450-CCA-R3-CD - Filed February 13, 2012**

Defendant, Bernardo Acuna Rodriguez, was indicted by the Warren County Grand Jury for second offense driving on a revoked license. Prior to trial, Defendant filed a motion to suppress evidence obtained as a result of the arresting officer's stop and seizure of Defendant. Following a hearing, the trial court granted Defendant's motion, and as a result, dismissed the indictment. The State now appeals. After a review of the record, we conclude that the officer's stop of Defendant was constitutionally valid, and therefore, the trial court's order granting Defendant's motion to suppress is reversed, the order dismissing the indictment is reversed, and this case is remanded.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Reversed and Remanded**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., joined. JUDGE J.C. MCLIN was originally on the panel to which this case was assigned. Judge McLin died September 3, 2011, and we acknowledge his faithful service to this Court.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; Lisa Zavogiannis, District Attorney General; and Darrell Julian, Assistant District Attorney General, for the appellant, State of Tennessee.

David L. Clarke, Manchester, Tennessee, for the appellee, Bernardo Acuna Rodriguez.

## OPINION

*Suppression hearing*

Officer Richard Hall, of the McMinnville Police Department, testified that he was on patrol duty at 7:00 a.m., on January 11, 2010. While parked in a parking lot at the corner of

Garfield Street and West End Avenue in McMinnville, he was casually conversing with another officer, Brandon Vann, who was parked next to him, when he observed a maroon, four-door vehicle pull out of the parking lot for the Westfield Manor apartment complex onto West End and stop in the roadway, blocking both lanes of traffic. The vehicle sat in the roadway for "about a minute" and then reversed back into the parking lot. Officer Hall testified that he did not recognize the vehicle. He testified, "[a]t that time, I thought that maybe something may be wrong, medical issue or possibly the driver may be possibly DUI." Officer Hall drove toward the vehicle and observed the vehicle turn left back into the apartment parking lot and drive behind the apartment complex. He noticed that the license plate number matched the license plate number of a vehicle registered to an owner whose license was revoked for DUI. The information about the owner's driver's license being revoked, as well as the license plate number, was previously given to Officer Hall by another police officer, who was never identified at the hearing. It was not until Officer Hall followed the vehicle into the parking lot that he recognized the license plate number. Officer Hall observed the vehicle pull into a parking spot, and Defendant exited the vehicle and began to walk toward the back of his vehicle. Officer Hall had activated his blue lights as he approached Defendant, after Defendant had exited his vehicle. Officer Hall "asked [Defendant] if everything was okay." Defendant answered, "yes," and Officer Hall asked him his name. Defendant told Officer Hall that his name was Bernardo, and Officer Hall asked if his last name was Rodriguez, to which he replied, "yes." Officer Hall testified that he knew Defendant's last name because it was the name given to him by the other officer. Officer Hall also testified that the vehicle matched the vehicle description given to him by the other officer.

Officer Hall contacted dispatch and confirmed that Defendant's driver's license was revoked for DUI. Officer Hall then arrested Defendant.

On cross-examination, Officer Hall testified that, at the time he observed the vehicle stopped in the roadway, he did not recognize it as the vehicle described to him by the other officer. He also testified that the length of time the vehicle was stopped in the roadway was "between a few seconds and a minute. I don't recall the exact time." No other vehicles traveled from either direction while Defendant was stopped in the roadway. When Defendant reversed back into the parking lot, there were no other vehicles behind him, and he did not otherwise impede traffic. Officer Hall did not recognize the license plate until Defendant "pulled in and parked." Officer Hall did not know Defendant's identity when he initially approached Defendant.

On redirect examination, Officer Hall testified that his sole purpose for driving towards the vehicle after observing it stop in the roadway was "[t]o check the driver's

welfare." On recross examination, Officer Hall further testified that he did not follow Defendant's vehicle because of any traffic violation he observed.

*Trial Court's Findings of Fact*

The trial court took the motion to suppress under advisement after the testimony and arguments of counsel were concluded. However, during the arguments of counsel, the trial court made some observations that could be considered factual findings. For instance, the following transpired between the prosecutor and the trial court:

[PROSECUTOR]: . . . I think what happens is from the time [Officer Hall] first sees [Defendant's] vehicle there is developing information that this car now matches a car that the police have an interest in because someone has been driving on a revoked driver's license. There is only one man in the car. [Officer Hall] follows [Defendant] into the driveway, back into his residence, and the man, you know, [Officer Hall] then sees the tag and the tag matches the tag number and the vehicle of the one that's been driving on a revoked driver's license.

THE COURT: And I would respectfully disagree. I don't think [Officer Hall] has got good enough information that the guy has done something illegal.

[PROSECUTOR]: But what information would [Officer Hall] then need if he has reliable information that this particular defendant is –

THE COURT: That goes back to my original theory. We had a case before where – I don't know if it was Officer Cantrell or whoever it was – had come out of General Sessions Court, seen a person's license revoked, and knew that it was revoked for a year and I think knew that the person was an illegal and could not get a driver's license. He sees him out a week or two later, knowing that there is no way he could get a license back, stops him, and I think that's fine but it's getting back to my original statement, officers just saying, hey, you might

-3-

want to watch for Josh, he might not have a driver's license, you might need to watch for Bill, heard he might be something and then that is sufficient evidence? I'm not sure that I'm okay with that, to stop somebody, and I think he stopped him not knowing – I mean, I guess he could have – his tag was valid. Once he got out he could have said, do you mind if I ask you for your driver's license without seizing him. But I'm just not sure I'm okay with another police officer told me that [name omitted] doesn't have a driver's license. I can stop [name omitted] whenever I want to.

We interpret the trial court's remarks set forth above to include an implicit finding of fact that the State failed to prove that Officer Hall had reliable information that the owner of the subject vehicle had a revoked driver's license, even though Officer Hall believed that information. It is fundamental that an officer's total failure to have reliable information that a crime has been or is about to be committed prevents a stop and seizure (based solely upon that unreliable information) from being a stop "based on reasonable suspicion, supported by specific and articulable facts." *See State v. Watkins*, 827 S.W.2d 293, 294 (Tenn. 1992).

Approximately one month after the suppression hearing, the trial court made its ruling and findings of fact in open court. We deem it necessary to set forth the entirety of this proceeding from the transcript in the record:

THE COURT: Okay. We have Bernardo Acuna Rodriguez. I want to thank both of you gentlemen for filing your briefs in that case. Both of you did a good job. You were very accurate with your arguments. I don't think there is a need for any additional proof. We took the proof and I remember it and you both recited it accurately in your briefs. I did read both of them. It is a very interesting case, and quite frankly, I think that regardless of how I rule, it probably needs to be taken up to the Court of Appeals and let them clarify some issues. I am going to rule that the officer did not initiate a traffic stop and that he did in fact seize the defendant when he initiated his blue lights. The officer did have some information that the owner of the vehicle in question did not have a valid driver's

-4-

license. That information came from another officer that I don't believe was named on a prior occasion. He had that information. I also find that the officer did not know that the person who was the owner of the car was the actual driver of that vehicle until he was stopped, approached, and then asked his name. Now, those are the findings. So, therefore I find that the stop was not valid based on the fact that there was no reasonable suspicion of even that person had committed an offense because he didn't know who the person was until he was stopped, and he was stopped when the blue lights were initiated. He was not stopped because of a traffic offense or a criminal offense. I give you thirty (30) days to appeal, and like I said, I think this is one that needs to be appealed.

[PROSECUTOR]: Your Honor, can I ask, are you thinking that the fact that he wasn't exercising his community caretaking function is . . . is that separate?

THE COURT: I don't think that he needed to initiate the blue lights at that point to be involved in the community caretaking function because the driver had pulled his car into a parking space and had exited the vehicle. So, I don't think he needed to stop him as I found with the blue lights at that point. I am not saying he wasn't going to check on the person, but I think he seized when he didn't need to when he hit the lights. I don't know if that is clear enough. I guess you need me to find was he engaged in community caretaking activity, no. I think he was engaged in activity to stop the person who was getting out of the vehicle to see if it was the person he thought didn't have a driver's license, if that helps. This will be one that will not offend me if I am wrong. Thank you gentlemen.

Subsequently, the trial court entered a written order granting the motion to suppress. The order set forth the following:

ORDER GRANTING MOTION TO SUPPRESS

This cause came on to be heard on the 25ᵗʰ day of August, 2010 before the Honorable Larry B. Stanley, Jr. Based upon testimony of witnesses, statements of counsel and the briefs filed by counsel, the Court finds that:

1.      The defendant was seized when the officer initiated his blue lights, which occurred after the defendant had parked and exited his vehicle.

2.      The officer who made the stop had received information from another officer that the owner of the vehicle in question did not have a valid driver's license.

3.      The officer that made the stop did not know that the owner of the vehicle was the actual driver of the vehicle until after the officer initiated his blue lights and approached the defendant who had already exited the vehicle.

4.      The officer was not exercising his community caretaking function when he initiated his blue lights and stopped the defendant.

5.      Therefore, the stop was not valid because there was no reasonable suspicion that the defendant had committed an offense because the officer did not know who the driver of the vehicle was until after he initiated his blue lights and stopped the defendant.

We conclude that the trial court implicitly found, in its written order, that the information from the unnamed police officer, which was relied upon by Officer Hall, was reliable. Comments by the trial court which indicated a factual finding that the State had failed to prove the reliability of the information were made before the trial court took the case under advisement. Further, the trial court did not include those comments in either the ruling from the bench or the written order granting the motion to suppress.

We conclude that the trial court based its ruling upon the fact that even though Officer Hall had reliable information that the owner of the vehicle had a revoked driver's license, Officer Hall did not know who had been driving the vehicle until he had already seized

Defendant, and therefore lacked reasonable suspicion that Defendant had committed an offense.

*Analysis*

The findings of fact made by the trial court at the hearing on a motion to suppress are binding upon this Court unless the evidence contained in the record preponderates against them. *State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence and resolve any conflicts in the evidence. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). However, this Court is not bound by the trial court's conclusions of law. *State v. Simpson*, 968 S.W.2d 776, 779 (Tenn. 1998). The application of the law to the facts found by the trial court are questions of law that this court reviews *de novo*. *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000).

Under both the federal and state constitutions, a warrantless search and seizure is presumed unreasonable, and the evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search and seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement. *State v. Binette*, 33 S.W.3d 215 (Tenn. 2000). "A police officer may make an investigatory stop of a motor vehicle when the officer has reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed." *Watkins*, 827 S.W.2d at 294 (citing *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868 (1968)). "In determining whether a police officer's reasonable suspicion is supported by specific and articulable facts, a court must consider the totality of the circumstances." *Watkins*, 827 S.W.2d at 294 (citing *U.S. v. Cortez*, 449 U.S. 411, 417 (1981)).

First, we conclude, and the State concedes, that Officer Hall's activation of the blue lights constituted a seizure of Defendant. The trial court found, and the totality of the circumstances shows, that the officer's activation of his blue lights was a show of authority. Specifically, when Officer Hall stopped Defendant, any concern Officer Hall had for Defendant's well being was abated when Officer Hall observed Defendant park his vehicle and exit and walk away from the vehicle without any indication that he was in any danger or distress.

The State asserts that the trial court erred by granting Defendant's motion to suppress Defendant's identity as the driver of the vehicle because the officer did not seize Defendant until after he had reasonable suspicion that Defendant was driving on a revoked license. We

must determine whether Officer Hall had "a reasonable suspicion, supported by specific and articulable facts, that a criminal offense ha[d] been or [was] about to be committed." *Watkins*, 827 S.W.2d at 294 (citing *Terry v. Ohio*, 392 U.S. at 21).

When evaluating whether a police officer's reasonable suspicion is supported by specific and articulable facts, a court "must consider the totality of the circumstances." *State v. Hord*, 106 S.W.3d 68, 71 (Tenn. Crim. App. 2002). This inquiry looks to such factors as the public interest served by the seizure, the nature and scope of the intrusion, and the objective facts on which the law enforcement officer relied in light of his experience. *See State v. Pulley*, 863 S.W.2d 29, 30-31 (Tenn. 1993). The objective facts on which an officer relies can include, but are not limited to, his or her own observations, information obtained from other officers or agencies, offenders' patterns of operation, and information from informants. *See State v. Lawson*, 929 S.W.2d 406, 408 (Tenn. Crim. App. 1996). Reasonable suspicion must be supported by something more than the officer's "inchoate and unparticularized suspicion or 'hunch.'" *State v. Day*, 263 S.W.3d 891, 902 (Tenn. 2008) (quoting *Terry*, 392 U.S. at 27, 88 S.Ct. 1868). However, "'reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause'" and "can arise from information that is less reliable than that required to show probable cause." *Id*. at 903 (quoting *State v. Pulley*, 863 S.W.2d 29, 32 (Tenn. 1993)).

The State relies primarily upon *Watkins*. In *Watkins*, the Tennessee Supreme Court upheld the constitutionality of an investigatory stop when the officers initiating the stop had personal knowledge that there was an outstanding capias for the defendant's arrest. Other officers had informed the arresting officers of the description of a vehicle driven by the defendant. The vehicle was a black Cadillac with the words "the Duke" written on it. *Id*. at 294. When officers saw a vehicle matching that description, they "decided to stop the vehicle and investigate the identity of the driver." *Id*. at 295. After stopping the vehicle, officers discovered that the defendant did not have a driver's license. They called dispatch to verify the outstanding capias and arrested the defendant. *Id*.

The State asserts that Officer Hall's reliance on the information from another officer is "no different" than the facts in *Watkins*. The State acknowledges that Officer Hall did not initially have reasonable suspicion to make a stop of Defendant's vehicle; however, the State asserts that reasonable suspicion arose when Officer Hall recognized the license plate number on the vehicle driven by Defendant.

Defendant distinguishes *Watkins*, pointing to the trial court's ruling in which the trial court found a lack of reliability in the information relied upon by Officer Hall. As stated

-8-

above, we conclude that the trial court ultimately did not make the finding of fact relied upon by defendant. We conclude that *Watkins* controls.

Although Defendant stopped in the roadway, blocking both lanes of traffic, and then reversed back into the parking lot, Officer Hall testified that there was no oncoming traffic, Defendant's driving did not impede traffic, and Defendant did not commit any traffic violations. At that point, Officer Hall only intended to check on Defendant's welfare. However, as Officer Hall got closer to the vehicle driven by Defendant, the officer noted that the description of the vehicle, and the vehicle's license plate number, matched a vehicle owned by a man whose driver's license was revoked. At that point, Officer Hall had reasonable suspicion, based upon specific and articulable facts, that Defendant had committed, in Officer Hall's presence, the offense of driving on a revoked license. During the investigatory stop, Officer Hall confirmed Defendant's identity and the status of his driver's license, which became the basis of probable cause for Defendant's arrest.

## CONCLUSION

Based upon our review of the record, it is our opinion that the officer had reasonable suspicion to justify his stop of Defendant. Accordingly, we reverse the order of the trial court granting Defendant's motion to suppress, reverse the order dismissing the indictment, and remand this case to the trial court for further proceedings.

_____
THOMAS T. WOODALL, JUDGE

-9-