IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 25, 2011

**STATE OF TENNESSEE v. SCOTTY LYNN EDMONDS**

**Appeal from the Criminal Court for Knox County**
**No. 92957      Mary Beth Leibowitz, Judge**

**No. E2011-00380-CCA-R3-CD - Filed April 23, 2012**

The Defendant, Scotty Lynn Edmonds, was convicted of driving under the influence (DUI), first offense, a Class A misdemeanor, and violation of the implied consent law, a Class C misdemeanor. See Tenn. Code Ann. §§ 55-10-401, -406. The trial court sentenced the Defendant to 11 months and 29 days with all but 5 days to be served on probation. In this appeal as of right, the Defendant contends (1) that the trial court erred in denying his motion to suppress evidence; and (2) that the evidence was insufficient to sustain his conviction for DUI, first offense. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

Mark E. Stephens, District Public Defender; Nathaniel H. Evans, Assistant Public Defender (at trial); and Gianna M. Maio, Assistant Public Defender (at trial and on appeal), for the appellant, Scotty Lynn Edmonds.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Randall Eugene Nichols, District Attorney General; and Kyle Hixson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

As a result of an incident that occurred during the early morning hours of October 23, 2008, the Defendant was indicted for DUI, violation of the implied consent law, failure to

stop at a stop sign, speeding, and failure to drive within a single lane of traffic.[1] The Defendant filed a motion to suppress "all evidence gained as a result of his October 23, 2008 arrest" because the "seizure and search were done without warrant or probable cause." The State filed a response to the Defendant's motion noting that the motion to suppress failed "to allege any facts that would support the suppression of any evidence in this case." The State requested that the Defendant file an amended motion stating with particularity the facts supporting his motion to suppress. The Defendant filed a second motion to suppress arguing that the Defendant's arrest "was the product of an unlawful stop because the officers had insufficient information to justify a stop, and [their] observations . . . were insufficient for a stop."

At the suppression hearing, Sergeant Stanley Cash of the Knoxville Police Department (KPD) was the only witness. Sgt. Cash testified that at approximately 1:30 a.m. on October 23, 2008, he and KPD Officer Khan Dururvurur were working "DUI enforcement" in west Knoxville. Sgt. Cash's cruiser was parked, with its headlights off, facing "a four-way stop" at the intersection of Nubbins Ridge and Morrell Road. Sgt. Cash testified that he observed the Defendant's "vehicle just disregard[] the stop sign" and drive "right through the intersection." Sgt. Cash further testified that the Defendant's vehicle made no attempt to slow down as it passed through the intersection. As Sgt. Cash began to pursue the Defendant, he saw the Defendant's taillights "leave the southbound lane and curve and cross over into the northbound lane and then come back." Sgt. Cash also testified that he established that the Defendant was speeding based on "the speed [he] had to go to catch" the Defendant. Sgt. Cash testified that the speed limit on that section of Morrell Road was 35 miles an hour and that he estimated that the Defendant was driving in excess of 50 miles an hour. Sgt. Cash testified that he eventually caught up with the Defendant when the Defendant's truck stopped at a red light at the intersection of Morrell Road and Northshore Drive. Sgt. Cash identified the Defendant as the driver of the truck.

On cross-examination, Sgt. Cash admitted that his cruiser video did not capture the Defendant's vehicle crossing over into the opposite lane. Sgt. Cash explained that the recorder was "in standby mode" and was recording "every other second to save space on the hard drive." Sgt. Cash also explained that while he was able to see the Defendant's taillights, the cruiser video camera was focused straight ahead and the Defendant was going around a curve when he crossed into the opposite lane of traffic. Sgt. Cash stated in the warrant that he "paced" the Defendant's vehicle to establish his speed. However, on cross-examination, Sgt. Cash admitted that he was not able to actually "pace" the Defendant because he could not maintain an equal distance between his cruiser and the Defendant's vehicle. Instead, Sgt.

---

[1]Prior to trial, the State dismissed the charges of failure to stop at a stop sign, speeding, and failure to drive within a single lane of traffic.

Cash explained that despite the fact he was going in excess of the speed limit, the Defendant "was definitely pulling away from [the officers]" and "accelerating beyond" them. Sgt. Cash testified that he did not think he would have caught up to the Defendant if it "hadn't been [for] the stop light." Sgt. Cash also admitted on cross-examination that he was "not sure" how fast he was going while pursuing the Defendant.

Sgt. Cash's cruiser video was played for the trial court at the suppression hearing. The video showed Sgt. Cash positioning his cruiser on Nubbins Ridge facing the intersection with Morrell Road. Almost immediately after Sgt. Cash turned off his headlights, the Defendant's headlights can be seen going through the intersection without stopping. The video then showed Sgt. Cash pursuing the Defendant. The Defendant was significantly ahead of Sgt. Cash, and there were portions of the video where the Defendant's taillights could not be seen. When Sgt. Cash eventually caught up to the Defendant, the Defendant was stopped in the left turn lane at a red light at the intersection of Morrell Road and Northshore Drive. Based upon the foregoing evidence, the trial court denied the Defendant's motion to suppress and stated that Sgt. Cash had a reasonable suspicion to stop the Defendant once he observed the Defendant's failure to stop at a stop sign.

At trial, Sgt. Cash's testimony about what he observed prior to stopping the Defendant closely matched his previous testimony at the suppression hearing. Sgt. Cash testified that the Defendant's "truck just blew through the stop sign. It didn't make any attempt to stop at all." According to Sgt. Cash, as he was turning right onto Morrell Road, he saw the Defendant cross over into the opposite lane of traffic. Sgt. Cash also testified that he was going "greater than 50 miles an hour" trying to catch up to the Defendant but the Defendant "was still accelerating away from [him]." Based on this, Sgt. Cash estimated the Defendant's speed to be "between 50 and 55" miles an hour. The Defendant's truck was stopped at the red light at the intersection of Northshore Drive and Morrell Road when Sgt. Cash caught up to it. Sgt. Cash testified that he then "[i]nitiate[d] a traffic stop," noticed that the Defendant's "eyes were glassy," and "detected some slurred speech." Sgt. Cash asked the Defendant "if he had been drinking" and the Defendant said "no." The Defendant consented to take a field sobriety test.

Sgt. Cash testified that he had the Defendant step out of his truck, that he patted down the Defendant, and then placed the Defendant in his cruiser. Sgt. Cash took the Defendant to a nearby gas station to perform the field sobriety tests while Officer Dururvurur moved the Defendant's truck. Sgt. Cash explained that he took the Defendant to the gas station as "a safety precaution" because he "didn't want to be in the middle of an intersection or on the side of the road" while performing the field sobriety tests. Sgt. Cash testified that he had the Defendant attempt two field sobriety tests, the "nine step walk-and-turn" and the "one leg

stand." Sgt. Cash testified that he gave the Defendant instructions for each of the tests and Officer Dururvurur demonstrated each of the tests before the Defendant attempted them.

Sgt. Cash explained to the jury that the "nine step walk-and-turn" test was designed to test a person's "divided attention." Sgt. Cash further explained that the test begins by asking the driver "to stand on [a] line, put one foot in front of the other touching heel to toe," and to stand with his hands to the side while the officer gives the instructions. The driver is then to take "nine heel to toe steps walking in a straight line" and on the ninth step "take a series of small steps, turn around, [and] take nine heel to toe steps back to the original point, counting each step." Sgt. Cash testified that the Defendant "performed poorly on the test." Sgt. Cash told the jury that the Defendant did not "touch heel to toe," that he stepped off the line, and that he raised his arm during each set of steps. Sgt. Cash also testified that the Defendant "seemed to have difficulty keeping his feet on the line during the instruction phase."

With respect to the "one leg stand" test, Sgt. Cash explained that it was designed to measure "divided attention," balance, and motor skills. Sgt. Cash testified that during the test, the driver is asked to stand on one leg with the opposite leg raised "six inches off the ground." The driver is to look down at his toe and count until told to stop. Sgt. Cash testified that this test lasts for about 30 seconds. Sgt. Cash told the jury that the Defendant performed poorly on this test and swayed, raised his arms, and put his foot down during the test. Based on the Defendant's performance on both the "nine step walk-and-turn" and the "one leg stand," Sgt. Cash concluded that the Defendant was intoxicated and not fit to drive a motor vehicle.

Sgt. Cash arrested the Defendant and explained to him Tennessee's implied consent law. Sgt. Cash testified that he explained to the Defendant the possible consequences if he refused to submit to a blood-alcohol test. Sgt. Cash told the jury that the Defendant refused to give him a straight answer about whether he would submit to a blood-alcohol test. The Defendant eventually asked Sgt. Cash what would happen if he refused to submit to a blood-alcohol test. Sgt. Cash told the Defendant that he would "be charged with implied consent" and the Defendant responded by saying "[w]ell, charge me." Sgt. Cash also testified that while the Defendant was in the backseat of his cruiser, he "admitted to drinking a beer."

On cross-examination, Sgt. Cash admitted that there was no evidence of alcohol in the Defendant's truck and that the Defendant had "an orderly appearance." Sgt. Cash testified that he thought the Defendant was resistant to him because he "had to ask [the Defendant] questions over and over and over and over and over again." However, Sgt. Cash admitted that the Defendant eventually answered his questions and that he was able to understand what the Defendant was saying. Sgt. Cash also testified on cross-examination that when he first

spoke to the Defendant, he did not smell alcohol, but when he "got closer to [the Defendant,]" he "got a moderate odor of alcohol." Sgt. Cash further testified on cross-examination that the Defendant "stumbled" while walking back to the cruiser. However, Sgt. Cash admitted that he was "not falling down" or "noticeably having difficulty walking."

Officer Dururvurur testified at trial that he was working with Sgt. Cash on October 23, 2008. Officer Dururvurur testified that as they escorted the Defendant from his truck to the police cruiser, the Defendant "had problems or issues trying to balance himself," and at one point, the Defendant held "the bed of the truck to balance himself." Officer Dururvurur recalled for the jury that he demonstrated both field sobriety tests to the Defendant and that the Defendant's performance on the tests was unsatisfactory. Officer Dururvurur also testified that he smelled alcohol on the Defendant's breath when the Defendant asked questions about the instructions for the field sobriety tests. Based on the Defendant's performance on the field sobriety tests, Officer Dururvurur concluded that the Defendant was intoxicated that night.

The jury was shown Sgt. Cash's cruiser video at trial. In addition to the portion of the video shown at the suppression hearing, the jury was also shown portions of the video dealing with Sgt. Cash's initial contact with the Defendant, the field sobriety tests, and the Defendant's subsequent arrest. The video showed that the Defendant was unsteady as he walked to and from the police cruiser. During the "nine step walk-and-turn," the Defendant was unable to stand still during the instructions, he was unable to walk in a straight line, and he was unable to walk heal to toe. During the "one leg stand," the Defendant put his foot down at least twice, swayed, and raised his arms. Once inside the cruiser, the Defendant responded to Sgt. Cash's questions about whether he would submit to a blood-alcohol test by repeatedly asking if he was under arrest for DUI. Ultimately, the Defendant told Sgt. Cash "to charge" him because he was "not drunk."

The Defendant told Sgt. Cash that he was "speeding, but not drunk." The Defendant then asked what his "probable cause" was. Sgt. Cash explained that he pulled the Defendant over for running a stop sign, speeding, and crossing into the opposite lane of traffic. The Defendant asked Sgt. Cash how fast he had been going. Sgt. Cash explained to the Defendant that he estimated his speed to be over 50 miles an hour. The Defendant then became belligerent and insisted that because Sgt. Cash did not know his exact speed, he did not have the right to stop the Defendant. The Defendant demanded that the officers tell him his exact speed approximately 100 times while he was in the backseat of the cruiser. When asked for his phone number and other simple biographical information, the Defendant responded by asking, "How fast was I going?" The Defendant's speech was noticeably slurred during portions of the video. The Defendant told Sgt. Cash that he suffered from no illnesses or injuries that "he knew of." When later asked by Sgt. Cash what he had to drink,

the Defendant responded that he had "one beer," a "tall boy," but that did not "make [him] drunk."

At trial, the Defendant testified that on October 22, 2008, he worked a ten-hour day at a mobile home dealership. After the Defendant returned home from work and had dinner, he went to his girlfriend's apartment between 10:00 and 11:00 p.m. The Defendant testified that while he was at his girlfriend's apartment, he ate some leftover pizza and had "one beer from a six pack." The Defendant explained to the jury that he had gone to his girlfriend's apartment to end their relationship and "try to comfort her." The Defendant testified that he planned on staying the night at his girlfriend's apartment but she became "emotional," so he decided to go home sometime after 1:00 a.m. The Defendant admitted that he "rolled through the stop sign" at the Morrell Road and Nubbins Ridge intersection. The Defendant explained that it was late, he "was tired," and that it was "fairly common" for people not to stop at the intersection. On cross-examination, the Defendant admitted that he had "been known to roll through that stop sign" on prior occasions. The Defendant also admitted that he was speeding that night and testified that he "was driving probably a few miles over 35." The Defendant denied crossing into the opposite lane of traffic.

The Defendant admitted that he lied to Sgt. Cash when he told him he had not had anything to drink that night. The Defendant explained his decision to lie by telling the jury that he "had laid down . . . to take a nap" before he left, that he "was sleepy," and that he was "an emotional wreck" because he had "just told the woman that [he] loved that [they were] not going to be together anymore." The Defendant claimed that he was "scared" that he would be "wrongly convicted of DUI" and "lose [his] license to sell" if he told Sgt. Cash that he had consumed one beer that night. The Defendant explained that his poor performance on the field sobriety tests was due to the fact that he was wearing "a pair of new cowboy boots" that night, that he had an undiagnosed condition that caused his feet to "burn" and "hurt," and that he had rolled up socks under the arches of his feet as "homemade. . . arch supports." The Defendant testified that he did not tell Sgt. Cash about the problems with his feet because he was embarrassed. The Defendant also explained that he thought the instructions to the tests were unclear and that he was nervous because "everything [he] own[ed] literally [was] riding" on the outcome of the field sobriety tests. The Defendant also told the jury that he was "tired, emotionally distraught, just a horrible day, mentally, physically exhausted" when he performed the field sobriety tests.

The Defendant testified that he behaved the way he did after his arrest because he had a "militant" and "persistent" personality. The Defendant told the jury that he refused to submit to a blood-alcohol test because, at the time, he "didn't see how it would benefit [him] at all to do it." The Defendant also testified that he refused a blood-alcohol test because he was "scared" and he did not see how him "having a needle stuck in [his] arm and . . . another

four or five hours of questioning" would have helped him. The Defendant explained that he asked the officer what his exact speed was approximately 100 times because he "thought with so much riding on that . . . [he] deserved . . . a clear answer" and not an estimation. The Defendant also explained to the jury what he meant when he told Sgt. Cash that he had a "tall boy." The Defendant testified that he "was referring to" one beer out of a six pack of beer in his girlfriend's refrigerator that was "taller than a regular can." The Defendant testified that he was not intoxicated when he was stopped by Sgt. Cash. The Defendant explained that someone was "under the influence" when they had "slurred speech, . . . the inability to make . . . wise decisions, . . . [and] usually a lot of people are angry, confrontational." However, the Defendant explained that he was not intoxicated because he was "215 pounds and [he] had dinner before [he] left [his] home. [He] had eaten pizza. One beer wouldn't" cause him to be intoxicated.

Based upon the foregoing evidence, the jury convicted the Defendant of DUI, first offense. The trial court found that the Defendant violated the implied consent law and revoked the Defendant's driving privileges for a period of one year. Following a sentencing hearing, the trial court sentenced the Defendant to 11 months and 29 days. Because the Defendant had a prior conviction for reckless driving, the trial court ordered the Defendant to serve five days in confinement with the remainder of his sentence to be served on probation. The Defendant filed a timely motion for new trial alleging that his arrest "was the product of an unlawful stop because the officers had insufficient information to justify a stop" and that the evidence was insufficient to sustain his conviction for DUI, first offense. The trial court denied the Defendant's motion for new trial, and this appeal followed.

## ANALYSIS

### I. Motion to Suppress

The Defendant contends that "the officers did not have [a] reasonable suspicion to justify" stopping him. The Defendant argues that the traffic violations observed by the officers were "legally insufficient to provide" a reasonable suspicion that the Defendant had committed a crime. The Defendant asserts that it was "a common practice" to "roll through" the stop sign at the intersection of Morrell Road and Nubbins Ridge; that despite the testimony of the officers, there was no evidence that his truck crossed into the opposite lane of traffic; and that the officers could not establish that he was speeding because they were unable to "pace" his vehicle. The State responds that the officers "had not only reasonable suspicion but also probable cause to stop the [D]efendant and issue a citation after witnessing him fail to stop at a stop sign."

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. State v. Binette, 33 S.W.3d 215, 217 (Tenn. 2000). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Both proof presented at the suppression hearing and proof presented at trial may be considered by an appellate court in deciding the propriety of the trial court's ruling on a motion to suppress. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998); State v. Perry, 13 S.W.3d 724, 737 (Tenn. Crim. App. 1999). However, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Furthermore, an appellate court's review of the trial court's application of law to the facts is conducted under a de novo standard of review. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001).

The Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect against unreasonable searches and seizures. Any warrantless search or seizure is presumed to be unreasonable and requires the State to prove by a preponderance of the evidence that the search or seizure was conducted pursuant to an exception to the warrant requirement. State v. Simpson, 968 S.W.2d 776, 780 (Tenn. 1998). However, a police officer may make an investigatory stop based upon reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed. Terry v. Ohio, 329 U.S. 1, 20-21 (1968); Binette, 33 S.W.3d at 218.

A police officer must have such a reasonable suspicion in order to stop a vehicle without a warrant. State v. Randolph, 74 S.W.3d 330, 334 (Tenn. 2002). Our supreme court has stated that "when an officer turns on [his] blue lights," a seizure has occurred. State v. Pulley, 863 S.W.2d 29, 30 (Tenn. 1993). Reasonable suspicion is determined by an examination of the totality of the circumstances. Binette, 33 S.W.3d at 218. Circumstances relevant to an analysis of reasonable suspicion include "the officer's objective observations [and any] [r]ational inferences and deductions that a trained officer may draw from the facts and circumstances known to him." State v. Yeargan, 958 S.W.2d 626, 632 (Tenn. 1997).

Tennessee Code Annotated section 55-8-149(c) provides that:

Every driver of a vehicle . . . approaching a stop sign shall stop before entering the crosswalk on the near side of the intersection, or in the event there is no crosswalk, shall stop at a clearly marked stop line, but if none, then at the point nearest the intersecting roadway where the driver . . . has a view of approaching traffic on the intersecting roadway before entering the

intersection, except when directed to proceed by a police officer or traffic control signal.

A violation of this section is a Class C misdemeanor. Tenn. Code Ann. § 55-8-149(d). This court has previously concluded that a defendant's failure to stop at stop sign provides officers with "probable cause to believe that a misdemeanor has been committed." State v. Baker, 966 S.W.2d 429, 432 (Tenn. Crim. App. 1997); see also State v. Damond Lavonzell Macon, No. W2001-02706-CCA-R3-CD, 2002 WL 925265, at *3 (Tenn. Crim. App. May 3, 2002) (Wade, J.) (concluding that the defendant's failure to stop at a stop sign provided "sufficient basis to warrant the stop"). Both officers testified that the Defendant went through the intersection without making any attempt to stop at the stop sign, and the cruiser video shows the Defendant's vehicle going through the intersection at a high rate of speed. As such, the officers had a sufficient basis to stop the Defendant after witnessing him fail to stop at a stop sign, regardless of whether the State could prove the remaining traffic violations. Accordingly, we conclude that the trial court did not err in denying the Defendant's motion to suppress.

## II. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his conviction for DUI, first offense. The Defendant argues that he "was cooperative and had an orderly appearance," there was no alcohol in his vehicle, and his "performance on the field sobriety tests . . . [was] not indicative of someone who [was] intoxicated"; therefore, the evidence was insufficient to sustain his conviction. The State responds that the evidence was sufficient to sustain the Defendant's conviction.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v.

Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

The Defendant was convicted of DUI in violation Tennessee Code Annotated section 55-10-401. The statute states, in pertinent part:

(a) It is unlawful for any person to drive or to be in physical control of any automobile or other motor driven vehicle on any of the public roads and highways of the state, or on any streets or alleys, or while on the premises of any shopping center, trailer park or any apartment house complex, or any other premises that is generally frequented by the public at large, while:

(1) Under the influence of any intoxicant, marijuana, controlled substance, drug, substance affecting the central nervous system or combination thereof that impairs the driver's ability to safely operate a motor vehicle by depriving the driver of the clearness of mind and control of himself which he would otherwise possess.

This court has held that in DUI cases, a police officer's testimony, by itself, is sufficient evidence to convict a defendant of DUI. See State v. Vasser, 870 S.W.2d 543, 544 (Tenn. Crim. App. 1993) (stating that the State did not need more than the deputy's testimony to prove its DUI case).

Here, both officers testified that they witnessed the Defendant run a stop sign, cross into the opposite lane of traffic, and speed prior to being stopped. Sgt. Cash testified that when he spoke to the Defendant, the Defendant's eyes were glassy and his speech was slurred. Both officers testified that the Defendant was unsteady on his feet as he approached the police cruiser and that he smelled of alcohol. The Defendant performed poorly on two field sobriety tests. During the "nine step walk-and-turn," the Defendant was unable to stand still during the instructions, he was unable to walk in a straight line, and he was unable to walk heal to toe. During the "one leg stand," the Defendant put his foot down at least twice, swayed, and raised his arms. Based upon this, both officers testified that they believed the Defendant was intoxicated. The Defendant refused a blood-alcohol test and became belligerent once he was placed in the backseat of the cruiser. The Defendant's speech was noticeably slurred during portions of the cruiser video. The Defendant eventually admitted to Sgt. Cash that he had a "tall boy" beer that night. It was well within the purview of the

jury to accredit the officers's testimony over the Defendant's. Based upon the foregoing, we conclude that the evidence was sufficient to sustain the Defendant's conviction for DUI, first offense. See State v. Troutman, 327 S.W.3d 717, 726 (Tenn. Crim. App. 2008) (concluding that the evidence was sufficient to sustain the defendant's conviction for DUI, first offense, where police officer had to "waive down" the defendant to get him to stop at a roadblock, the defendant's speech was slurred, the defendant smelled of alcohol, the defendant failed three field sobriety tests, and the defendant admitted to drinking a "hot beer" that night).

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE